In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 01-2098 and 01-2359

ELIZABETH DOYLE,

*Plaintiff-Appellant,*

*v.*

CAMELOT CARE CENTERS, INCORPORATED, a Delaware
corporation, JESS MCDONALD, Director of the Illinois
Department of Children and Family Services, in his
individual capacity, EDWARD COTTON, Director of the
Division of Child Protection for DCFS, in his individual
capacity, et al.,

*Defendants-Appellees.*

---

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 2450—**Rebecca R. Pallmeyer**, *Judge.*

---

No. 01-2232

PEARCE KONOLD,

*Plaintiff-Appellant,*

*v.*

CENTRAL BAPTIST CHILDREN'S HOME & FAMILY SERVICES,
a not-for-profit corporation, HUDELSON BAPTIST CHILDREN'S
HOME, a not-for-profit corporation, and JESS MCDONALD,
director of the Illinois Department of Children and Family
Services (DCFS), in his individual capacity, et al.,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Southern District of Illinois.
No. 00 C 377—**David R. Herndon**, *Judge.*

————————

ARGUED FEBRUARY 20, 2002—DECIDED AUGUST 30, 2002

————————

Before BAUER, RIPPLE and MANION, *Circuit Judges.*

RIPPLE, *Circuit Judge.* In 1998, after a brief investigation and ex parte proceeding, officials of the Illinois Department of Children and Family Services ("DCFS") indicated Elizabeth Doyle for medical neglect of a minor. These officials not only recorded this determination in a statewide registry but also disclosed their findings to Ms. Doyle's employer, Camelot Care Centers, Inc., ("Camelot") a private child-care provider. Upon learning of this determination, Camelot terminated Ms. Doyle's employment. After a protracted appeals process, Ms. Doyle ultimately obtained the expungement of the report from the statewide registry. During the same period, Pearce Konold, a social worker, had a similar experience with DCFS and his employer, Central Baptist Children's Home and Family Services ("Central Baptist").

Soon after, Ms. Doyle and Mr. Konold filed separate § 1983 actions against their respective employers and various DCFS officials in their individual capacities. The complaints alleged that these various individuals and corporate entities had deprived Ms. Doyle and Mr. Konold of a protected liberty interest without due process of law. The district court for the Northern District of Illinois ("Northern District") dismissed Ms. Doyle's complaint, concluding that many of the DCFS employees were entitled to absolute or qualified immunity. The Northern District dismissed the remaining defendants on the ground that

Ms. Doyle had failed to plead claims against them. The district court for the Southern District of Illinois ("Southern District") dismissed Mr. Konold's action. That court concluded that the Eleventh Amendment barred the claims against the DCFS employees and that Mr. Konold's employer, Central Baptist, was not a state actor. Ms. Doyle and Mr. Konold appealed these determinations, and we consolidated the cases for review. For the reasons set forth in the following opinion, we affirm the judgments of the district courts.

# I

# BACKGROUND

## A. Facts

### 1. The DCFS Reporting System

The Illinois legislature has created a comprehensive program for reporting, investigating and ultimately documenting alleged incidents of child abuse and neglect that occur within the State. Administered by DCFS, the program's framework can be found in the Illinois Abused and Neglected Child Reporting Act ("ANCRA"), 325 ILCS 5/1 et seq., and related administrative regulations.

Under ANCRA, the investigatory process begins when an individual reports an alleged incident of abuse or neglect to DCFS. To encourage reporting, the statute requires DCFS to maintain a twenty-four hour hotline that any individual may use to inform the agency of possible child abuse or neglect. Anyone may report an incident. However, the State requires certain individuals—such as, school personnel, social workers and police officers—to contact DCFS if, in their official or professional capacity, they have reasonable cause to believe that a child may be abused or neglected. Typically, when an individual reports

an incident, he must include the child's age, the identity of the alleged perpetrator and any other information that may prove helpful to DCFS. To dissuade spurious reports, ANCRA establishes criminal penalties for those who tender false allegations to the agency.

If DCFS concludes that a report contains a good faith indication of abuse or neglect, the agency assigns the matter to one of its investigators for a formal investigation. The onset of this formal investigation has several ramifications. First, if

> the person who is alleged to have caused the abuse or neglect is employed or otherwise engaged in an activity resulting in frequent contact with children and the alleged abuse or neglect are in the course of such employment or activity, then [DCFS] shall . . . inform the appropriate supervisor or administrator of that employment or activity that [DCFS] has commenced a formal investigation pursuant to [ANCRA], which may or may not result in an indicated report.

325 ILCS 5/7.4(b)(4). Moreover, once DCFS informs a licensed child care facility that one of its employees is the subject of a DCFS formal investigation, state law mandates that the employer "shall take reasonable action necessary to insure that the employee . . . is restricted during the pendency of the investigation from contact with children whose care has been entrusted to the facility." 225 ILCS 10/4.3.

ANCRA requires DCFS to complete its formal investigation within a specified time period and transmit its findings to the State's central register.[1] During the investigation, Illinois law imposes certain minimum obligations

---

[1] In general terms, the central register is a database that records cases of suspected child abuse or neglect.

upon the DCFS investigator. For instance, before rendering a decision on the report, the investigator must have or attempt to have direct, in-person contact with the alleged victim, the alleged victim's caretaker and the alleged perpetrator. After considering these materials, the investigator determines whether there is credible evidence that the alleged perpetrator engaged in child abuse or neglect. If answered in the negative, the report is termed "unfounded." 325 ILCS 5/3. However, when credible evidence of abuse or neglect does exist, the investigator concludes that the alleged report is "indicated." *Id.*

DCFS transmits its indicated determinations to the central register. As a general rule, the investigator's findings and the contents of the central register remain confidential. In some instances, however, Illinois law authorizes DCFS to release its conclusions to certain individuals.[2] In particular, if the alleged perpetrator works in a position that involves frequent contact with children, the agency informs his employer of the results of the formal investigation.

DCFS also sends a written notice to the alleged perpetrator advising the individual whether the report of abuse or neglect was unfounded or indicated. DCFS advises the individual that administrative review of an indicated finding may be sought within sixty days. If no appeal is taken, the indicated report serves as the agency's final decision in the case; the finding may not be expunged from the central register for a prescribed period of time.

When an individual files a timely request for review, DCFS provides him with a redacted copy of the investiga-

---

[2] Unauthorized disclosures are subject to criminal penalties. *See* 325 ILCS 5/11.

tive file[3] as well as an appeal form. The person seeking an appeal must return the completed appeal form to DCFS within an applicable time frame. In addition, the individual may enclose a written statement identifying facts that would support the expungement of the indicated report from the central register. Within thirty days of receiving this material, a DCFS review panel must complete its evaluation of the investigative file and the individual's statement. In performing this review, DCFS examines the materials for credible evidence of abuse or neglect, the same standard employed during the initial phase of the investigation.

If the review panel declines to expunge the indicated report from the central register, an individual may seek an administrative hearing. Once requested, the hearing must be scheduled by the head of the Administrative Hearing Unit ("AHU") within thirty days. During this administrative hearing, which is adversarial in nature, the indicated individual may present evidence and cross-examine the agency's witnesses. Throughout this proceeding, DCFS bears the burden of justifying by a preponderance of the evidence its decision to indicate the individual. At the conclusion of the hearing, the Administrative Law Judge ("ALJ") submits his recommendation to the DCFS Director who renders a final decision in the matter. If dissatisfied with this final determination, the indicated individual may seek judicial review of the agency's decision in the Illinois courts.

---

[3] State law requires certain confidential information deleted from the files.

### 2. Ms. Doyle

Camelot Care Centers, Inc., is a private, for-profit corporation that provides child welfare services in numerous states. Pursuant to a contract with DCFS, Camelot provides certain services to foster children under the care of the State of Illinois. For instance, Camelot offers a therapeutic program for the agency's foster children. Elizabeth Doyle served as the director of this initiative. In this role, Ms. Doyle merely administered the therapeutic program. She neither counseled foster children nor directly provided them with medical care.

During December 1997, K.F., a foster child enrolled in the therapeutic program, allegedly consumed a sizable quantity of Tylenol capsules. The child overdosed, resulting in her brief hospitalization. K.F.'s boyfriend reported this incident to the DCFS hotline; he suggested that K.F.'s foster parents had been negligent.

DCFS commenced an investigation into these allegations. In early May 1998, DCFS investigators, Antonia McWilliams and Linder Harrington, concluded that credible evidence existed to indicate Ms. Doyle, among others, for medical neglect of this child. Joseph Becerra, Marilyn O'Leary and Peggy Everling supervised the inquiry and approved the investigators' findings. Despite the decision to indicate Ms. Doyle for medical neglect, no one sent her a written notice detailing this decision. Generally, responsibility for sending such notices fell to DCFS official, Linda Everette-Williams.

On May 6, 1998, Ms. Doyle learned of the indicated report from her attorney. Apprised of the agency's decision, Ms. Doyle promptly relayed this information to her supervisor at Camelot, Sue Roselle. The following day, Roselle twice contacted DCFS Licensing Supervisor Michael

Maloney. During these conversations, Mr. Maloney alleg-
edly informed Camelot of the indicated report against
Ms. Doyle;[4] he purportedly stated that this determina-
tion precluded the corporation from employing her.[5] On
May 8, 1998, Camelot terminated Ms. Doyle.

Soon after, a review panel comprised of DCFS employ-
ees declined to expunge the indicated report. In Septem-
ber 1998, Ms. Doyle filed a timely request for an admin-
istrative hearing. Despite the State mandate to docket
appeals within thirty days, Matthew Franklin, DCFS
Chief ALJ and head of the AHU, did not schedule a hear-
ing in Ms. Doyle's case until January 27, 1999. Numerous
continuances further postponed the hearing until May. The
ALJ ultimately declined to expunge the indicated report,
and DCFS Director Jess McDonald agreed. When Ms.
Doyle finally sought review of this determination in state
court, DCFS entered into an agreement with her that led to
the expungement of the indicated finding from the central
register.

### 3. Mr. Konold

Mr. Konold, a licensed social worker, served as a super-
visor at Hudelson Baptist Children's Home ("Hudelson"),

[4] Ms. Everette-Williams, who also administered the central
register, did not record the indicated finding in this statewide
database until May 18, 1998.

[5] Other portions of Ms. Doyle's complaint elaborate on Mr.
Maloney's statements. In particular, the complaint notes that:
"DCFS Licensing Supervisor Maloney told Sue Roselle of
Camelot that [Ms. Doyle] . . . could no longer be employed at
Camelot in a position where [she] would have access to chil-
dren." Doyle Complaint, R.1-1 at 27.

a child welfare agency that provides emotional treatment for children, including state wards. Central Baptist Children's Home and Family Services, a not-for-profit corporation, operated Hudelson under a management contract. Consequently, members of the Hudelson staff worked for Central Baptist.

In September 1997, Mr. Konold filed a report with the DCFS hotline indicating that certain state wards had engaged in inappropriate sexual play. At the direction of DCFS, two of the agency's employees, Arden Ancona and Jamie Ralph, commenced an investigation into Mr. Konold's report. DCFS supervisor Terry Whipple oversaw the inquiry. The investigators ultimately indicated Mr. Konold for abuse and neglect, citing his alleged failure to follow a DCFS plan for the state wards. Edward Wojnarowski, a manager at DCFS, approved the indicated finding.

During November 1997, DCFS faxed a letter to Hudelson and Mr. Konold informing them that the agency intended to indicate Mr. Konold for abuse and neglect. The letter cautioned, however, that it did not function as an official notice of DCFS' findings. Based on this letter, Central Baptist terminated Mr. Konold's employment.

On December 17, 1997, although he had yet to receive a formal notice of the indicated report, Mr. Konold filed a request for an internal review of this finding. Several days later, Ms. Everette-Williams finally sent Mr. Konold a formal notice of the agency's decision along with a redacted case file. However, the notice did not describe in detail the specific allegations against Mr. Konold. In any event, a panel composed of Mr. Wojnarowski and Brad Leckey, a DCFS supervisor, ultimately reviewed Mr. Konold's file, but declined to expunge the indicated report.

During April 1998, Mr. Konold filed a timely request for an administrative hearing. Soon after, Mary Kennedy, DCFS Chief ALJ and head of the AHU,[6] informed him that, due to numerous requests for administrative hearings, proceedings in his case would be delayed. In March 1999, Mr. Konold finally received an administrative hearing, and the ALJ concluded that the indicated report should be expunged. DCFS Director McDonald affirmed this finding.

## B. District Court Proceedings

### 1. Ms. Doyle

On April 24, 2000, Ms. Doyle filed her § 1983 action in the Northern District. She alleged that ten DCFS employees[7] and her former employer, Camelot, had precluded her from working in the profession of her choice without due process of law. More precisely, noting that the indicated report effectively blacklisted her from employment in the child-care sector, Ms. Doyle asserted that the manner in which the DCFS employees investigated, recorded and ultimately disclosed this finding violated the mini-

---

[6] According to the complaints, Ms. Kennedy preceded Mr. Franklin as Chief ALJ for DCFS.

[7] More precisely, Ms. Doyle filed this action against the following DCFS employees in their individual capacities: DCFS Director Jess McDonald, Deputy DCFS Director Edward Cotton, Chief ALJ Matthew Franklin, Administrator of the Central Register Linda Everette-Williams, Licensing Supervisor Michael Maloney, supervisors Joseph Becerra, Marilyn O'Leary and Peggy Everling, and investigators Linder Harrington and Antonia McWilliams.

mum requirements of due process. The complaint also emphasized that Ms. Doyle failed to receive formal notice of the indicated finding and that her request for an administrative hearing languished for months with DCFS officials. Moreover, according to Ms. Doyle, Camelot functioned as a state actor that had been complicit in the constitutional deprivation. Asserting various defenses, the DCFS employees and Camelot moved to dismiss the complaint.

After considering the parties' positions, the Northern District granted the motion. Although dismissing Ms. Doyle's complaint, the Northern District rejected the contention of the DCFS employees that the Eleventh Amendment barred the claims against them. The Northern District noted the principle set forth in *Hafer v. Melo*, 502 U.S. 21 (1991), that individual capacity actions generally do not implicate the Eleventh Amendment and concluded that Ms. Doyle had pleaded sufficiently the individual capacity of each DCFS employee. Although sovereign immunity did not preclude Ms. Doyle's action, other immunity doctrines nevertheless proved fatal to her case. In particular, the district court determined that the DCFS employees personally involved in investigating and recording the indicated report under the credible evidence standard were entitled to qualified immunity. Acknowledging that Ms. Doyle had produced three cases criticizing the credible evidence standard, the Northern District observed that these decisions proved insufficient to defeat the defendants' claims of qualified immunity. Turning to the scheduling claims against Chief ALJ Franklin, the doctrine of absolute immunity barred this portion of the action. More precisely, in the district court's estimation, the task of scheduling hearings formed an integral part of the Chief ALJ's judicial function; as such,

absolute judicial immunity shielded him from suit. Finally, according to the Northern District, Ms. Doyle failed to allege adequately that the remaining defendants, including Camelot, had deprived her of a constitutional right.

### 2. Mr. Konold

During 2000, Mr. Konold filed his § 1983 action in the Southern District. The complaint named as defendants ten DCFS employees in their individual capacities[8] as well as the private entities Central Baptist and Hudelson. Mr. Konold's allegations largely mirrored those of Ms. Doyle. Asserting various defenses, the DCFS employees, Camelot and Hudelson moved to the dismiss the complaint.

After considering the parties' positions, the Southern District granted the motion to dismiss. Although recognizing that Mr. Konold had pleaded the various state employees in their individual capacities, the Southern District concluded that the Eleventh Amendment barred this portion of the action. In particular, after reviewing Mr. Konold's complaint, the district court declined to characterize the action as one against state officials in their individual capacities. Rather, construing the action as against the state agency itself, the Southern District considered the individual capacity caption a mere guise to avoid the implications of the Eleventh Amendment. Given this con-

---

[8] Mr. Konold filed this action against the following DCFS employees in their individual capacities: DCFS Director Jess McDonald, Deputy DCFS Director Edward Cotton, Chief ALJs Matthew Franklin and Mary Kennedy, Administrator of the Central Register Linda Everette-Williams, supervisors Edward Wojnarowski, Terry Whipple and Brad Leckey, and investigators Arden Ancona and Jamie Ralph.

struction of Mr. Konold's complaint, principles of sovereign immunity barred this portion of his action.[9]

Turning to the claims against the private corporations, the Southern District rejected Mr. Konold's contention that Central Baptist and Hudelson functioned as state actors. According to the Southern District, although Illinois extensively regulated these child-care providers, this situation did not convert Central Baptist and Hudelson into state actors. In addition, the court rejected the contention that these private corporations performed an exclusive state function, caring for foster children.

## II

## DISCUSSION

Ms. Doyle and Mr. Konold submit that the manner in which the DCFS employees administered three aspects

---

[9] In their briefs to this court, none of the DCFS employees urge that we affirm the district courts' judgments on this ground. Indeed, their briefs are devoid of any reference to the Eleventh Amendment or sovereign immunity principles. During oral argument, we asked counsel for the DCFS employees to clarify his clients' position on this matter. He stated that his clients disavowed any reliance on the Eleventh Amendment, conceding that sovereign immunity principles generally do not bar actions against state officials in their individual capacities. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991). Indeed, when read fairly, the complaints in this case do not mount a generalized attack on the state agency; rather, they submit that the manner in which the individual DCFS employees administered the reporting and investigatory scheme deprived Mr. Konold and Ms. Doyle of due process of law. Given these circumstances, we do not address in any further detail this portion of the Southern District's judgment.

of the agency's abuse and reporting scheme deprived them of a protected liberty interest without due process of law. According to Ms. Doyle and Mr. Konold, the deficient aspects of the process include: the use of the credible evidence standard during much of the administrative proceedings ("credible evidence claims"), the failure to provide them with adequate notice of the findings against them ("notice claims") and the lengthy delay preceding their respective post-deprivation hearings ("hearing claims"). Moreover, they allege that their respective employers, Camelot and Central Baptist,[10] functioned as state actors that were complicit in this constitutional deprivation.

In response, the DCFS employees contend that their conduct deprived neither Ms. Doyle nor Mr. Konold of a constitutional right. Should we disagree with that proposition, they submit that the doctrines of qualified and absolute immunity bar the claims against them. In addition, Camelot and Central Baptist posit that they are not state actors and that they did not deprive their former employees of any constitutional rights.

In considering these contentions, we are mindful of the procedural posture of this case. We not only accept as true all of the well-pleaded factual allegations in the plaintiffs' complaints but also draw all reasonable inferences in the plaintiffs' favor. *See Tobin for Governor v. Ill. State Bd. of Elections,* 268 F.3d 517, 521 (7th Cir. 2001). We, however, need not accept as true "conclusory statements of law or unsupported conclusions of fact." *McLeod v. Arrow Marine Transp., Inc.,* 258 F.3d 608, 614 (7th Cir. 2001).

---

[10] When referencing claims against Central Baptist, we address allegations against Hudelson as well.

After reviewing the plaintiffs' pleadings under these rules, if it appears beyond doubt that they cannot prove any set of facts that would entitle them to relief, then we shall affirm the district courts' dismissals of the complaints. *See Tobin for Governor*, 268 F.3d at 521.

### A.

Before turning to the merits, we briefly consider whether Ms. Doyle and Mr. Konold have alleged adequately the personal involvement of each named defendant in the purported constitutional violations. It is well-established that a plaintiff only may bring a § 1983 claim against those individuals personally responsible for the constitutional deprivation. *See Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). Moreover, under § 1983, a plaintiff may not rely on the doctrine of respondeat superior to hold supervisory officials liable for the misconduct of their subordinates. *See id.* Rather, the supervisory officials also must have had some personal involvement in the constitutional deprivation, essentially directing or consenting to the challenged conduct. *See Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001).

We begin with the credible evidence claims. In general terms, the complaints allege that due process requirements were not satisfied when the DCFS employees used the credible evidence standard throughout much of the agency's administrative process. Concerning this claim, the complaints adequately allege the personal involvement of the DCFS investigators, their supervisors, as well as administrator Ms. Everette-Williams. According to the complaints, the investigators, Mr. Harrington, Ms. Mc-Williams, Ms. Ancona and Mr. Ralph, inquired into the allegations and rendered indicated reports using only the

credible evidence standard. Their supervisors, Mr. Becerra, Ms. O'Leary, Ms. Everling, Mr. Wojnarowski, Mr. Whipple and Mr. Leckey, approved these findings and otherwise enforced the purportedly unconstitutional policy of indicating individuals on the basis of credible evidence. Administrator Ms. Everette-Williams then permitted these indicated reports to be recorded in the central register. In addition, in his brief to this court, Mr. Maloney concedes his personal involvement in these allegations. *See* DCFS Appellees' Br. at 25.

Ms. Doyle and Mr. Konold also allege that DCFS Director McDonald and Deputy Director Cotton are liable for the credible evidence claims. As supervisory officials, they may not be held liable simply for the purported unconstitutional conduct of their subordinates; rather, the complaints must allege adequately that Mr. McDonald and Mr. Cotton participated in the constitutional deprivation. Ms. Doyle and Mr. Konold allege that the DCFS Director and his deputy personally were responsible for creating the policies, practices and customs that caused the constitutional deprivations. Under the notice pleading regime, these allegations, charitably read, suffice at this stage in the litigation to demonstrate Mr. McDonald's and Mr. Cotton's personal involvement in this purported unconstitutional conduct. In sum, regarding the credible evidence claims, Ms. Doyle and Mr. Konold alleged adequately the personal involvement of each DCFS employee except Chief ALJs Franklin and Kennedy. Consequently, we affirm the dismissals of the credible evidence claims against the Chief ALJs.

We next turn to the hearing claims. More precisely, Ms. Doyle and Mr. Konold submit that they failed to receive a timely post-deprivation hearing. As the individuals in charge of scheduling administrative hearings,

Chief ALJs Kennedy and Franklin were personally involved in this alleged constitutional violation. We do not believe, however, that the complaint adequately alleges Director McDonald's personal involvement in this matter. The official policy of DCFS requires that the Chief ALJs schedule a hearing within thirty days. The allegations in the complaints simply are insufficient to establish Director McDonald's personal involvement in this delay. We also reject the contention that Deputy Director Cotton was personally involved in this claim. Both complaints indicate that he created policy, practices and customs for the Division of Child Protection, the investigatory wing of DCFS. As such, the complaints do not allege that he had involvement in or policy control over matters related to the hearing claims. Consequently, we affirm the district courts' dismissals of the hearing claims against all DCFS employees except Chief ALJ Franklin and Chief ALJ Kennedy.

Finally, we consider the inadequate notice claims. Regarding these allegations, Mr. Konold and Ms. Doyle submit that they failed to receive adequate notice either of the indicated findings or of the evidence relied upon in reaching this determination. The complaints adequately allege the personal involvement of Ms. Everette-Williams in this purported deprivation. Ms. Everette-Williams was the official responsible for sending the notices in a prompt manner. In their briefs to this court, Chief ALJs Franklin and Kennedy concede their personal involvement in this claim. As such, the district courts correctly dismissed the inadequate notice claims against all of the DCFS employees except Ms. Everette-Williams, Chief ALJ Franklin and Chief ALJ Kennedy.

**B.**

We turn to the parties' principal substantive dispute: Whether qualified immunity shields from liability those DCFS employees who, using the credible evidence standard, indicated Ms. Doyle and Mr. Konold for abuse and neglect, placed their names in the central register and disclosed this finding to their employers. As a general rule, courts must engage in a two-part inquiry to assess if a defendant may assert a defense of qualified immunity. We "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, [we then] proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998). We proceed in this manner because, as the Supreme Court has noted, this methodology "promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Wilson*, 526 U.S. at 609.

**1.**

We turn to the first step of our inquiry, assessing whether Ms. Doyle and Mr. Konold have alleged adequately violations of their constitutional rights. More precisely, they submit that the use of the credible evidence standard throughout this predominately ex parte proceeding failed to afford them due process of law. Simply put, Ms. Doyle and Mr. Konold assert procedural due process claims against the DCFS employees.

To maintain such an action, a plaintiff must establish that a state actor has deprived him of a constitutionally protected liberty or property interest without due process of

law. *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990); *see also Mason v. Sybinski*, 280 F.3d 788, 794 (7th Cir. 2002). Consequently, we must examine the complaints in this case to determine if they allege adequately that: (1) Ms. Doyle and Mr. Konold possessed a constitutionally protected liberty interest;[11] and (2) a state actor caused a deprivation of that liberty interest without due process of law. If Ms. Doyle and Mr. Konold did not plead adequately either component, then they have failed to allege a viable constitutional claim, negating the need to address the DCFS employees' claims of qualified immunity.

### a.

Ms. Doyle and Mr. Konold allege that the DCFS employees deprived them of a protected liberty interest. More precisely, they submit that the indicated findings of abuse and neglect effectively precluded them from obtaining employment in their field of choice, child-care services.

It is well-settled that an individual has no cognizable liberty interest in his reputation; consequently, when a state actor makes allegations that merely damage a person's reputation, no federally protected liberty interest has been implicated. *See Paul v. Davis*, 424 U.S. 693, 711-12 (1976); *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 548 (7th Cir.

---

[11] Ms. Doyle and Mr. Konold were at-will employees. Neither individual has alleged additional facts that demonstrate their terminations implicated a protected property interest. Indeed, before this court, they do not argue that the conduct of the DCFS employees or the private entities deprived them of a protected property interest. Consequently, we limit our discussion to Ms. Doyle's and Mr. Konold's claims concerning the deprivation of a protected liberty interest.

2002). Indeed, "mere defamation by the government does not deprive a person of liberty protected by the Fourteenth Amendment, even when it causes serious impairment of one's future employment." *Hojnacki*, 285 F.3d at 548 (internal quotations and citations omitted). Rather, it is only the "alteration of legal status," such as governmental deprivation of a right previously held, "which, combined with the injury resulting from the defamation, justif[ies] the invocation of procedural safeguards." *Paul*, 524 U.S. at 708-09; *Townsend v. Vallas*, 256 F.3d 661, 669 (7th Cir. 2001). As such, when a state actor casts doubt on an individual's "good name, reputation, honor or integrity" in such a manner that it becomes "virtually impossible for the [individual] to find new employment in his chosen field," the government has infringed upon that individual's liberty interest to pursue the occupation of his choice. *Townsend*, 256 F.3d at 670.

Ms. Doyle and Mr. Konold, through their complaints, have alleged sufficiently a deprivation of their liberty interests. They note that, in performing background checks on prospective employees, most, if not all, child-care providers contact the central register to determine if the applicant has been indicated for abuse or neglect. Once a prospective employer learns of the indicated finding, it is reluctant to ignore state laws that "strongly discourage or effectively prohibit" the hiring of an individual recorded in the central register. Doyle Complaint, R.1-1 at 17. Consequently, these allegations, if proven, would establish that the indicated findings infringed upon Ms. Doyle's and Mr. Konold's liberty interests to pursue the occupation of their choice, child-care services.

**b.**

Although Ms. Doyle and Mr. Konold have alleged adequately a deprivation of a protected liberty interest, we must consider whether that deprivation occurred without due process of law.[12] It is a fundamental tenet of due process that, when the government deprives an individual of a protected liberty interest, that individual must be afforded not only adequate notice but also a reasonable opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Davis v. Scherer*, 468 U.S. 183, 200 (1984) (Brennan, J., concurring in part, and dissenting in part). However, the precise timing and form of the procedures that the government must afford an individual hinge upon the particularities of the situation. As the Supreme Court often has emphasized, due process "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 895 (1961)). To the contrary, due process is flexible, requiring different procedural protections depending upon the situation at hand. *See Gilbert*, 520 U.S. at 930.

To determine the process constitutionally due an individual in a given circumstance, the Supreme Court has instructed courts to consider three factors. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). We are to balance

> [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous dep-

---

[12] *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990) ("[T]he deprivation by state action of a constitutionally protected interest in life, liberty, or property is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law.").

rivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335. Although establishing guideposts concerning the adequacy of particular procedures, the *Mathews* factors embody the hallmark of due process—flexibility. Indeed, *Mathews*' progeny is indicative of this fact.

For instance, due process does not require a plenary hearing prior to the deprivation of every cognizable liberty or property interest. The Supreme Court has recognized that the practical exigencies of a situation may often counsel against affording plenary pre-deprivation process to an individual. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545-47 (1985). In certain circumstances, then, an abbreviated pre-deprivation hearing will suffice provided that the government offers within a reasonable time a more complete opportunity to be heard. *Id.* Indeed, the Court has noted that an "important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." *Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 240 (1988); *see also Gilbert*, 520 U.S. at 930-31. The constitutionality of such schemes, however, frequently turns on the availability of sufficiently prompt post-deprivation hearings.

Considering this case in light of *Mathews* and its progeny, Ms. Doyle and Mr. Konold have significant interests at stake. According to their complaints, the indicated findings

essentially preclude their employment in the child-care industry. As the DCFS employees concede, this deprivation affects an undoubtedly important interest—an individual's ability to work. *See, e.g., Mallen*, 486 U.S. at 240.

We turn then to the procedures afforded the indicated individuals. In large measure, the agency's scheme is predominately an ex parte process that permits an individual to be placed in the central register so long as credible evidence of child abuse or neglect exists. According to the allegations before us, this credible evidence standard establishes a meager evidentiary threshold. Under this criterion, any plausible evidence of abuse or neglect may produce an indicated finding. Indeed, this standard apparently does not even require that the investigator weigh conflicting evidence in reaching his determination. *See Cavarretta v. Dep't of Children & Family Servs.*, 660 N.E.2d 250, 258 (Ill. App. Ct. 1996). Based on this thin evidence, and prior to an adversarial hearing that may develop a more complete and balanced record, DCFS discloses this finding to current and prospective employers of the indicated individual. Moreover, the complaints suggest that DCFS does not apprise an employer that the indicated individual has yet to receive a meaningful opportunity to challenge these allegations. By its nature, this low evidentiary standard coupled with an initial ex parte determination seems prone to produce mistaken indicated findings against innocent individuals. Given this possibility, DCFS' current method of disclosing the indicated findings to an individual's current and prospective employers based only on the credible evidence standard creates a perceptible risk of erroneous deprivations.

At the same time, DCFS' interest in employing this particular scheme is far from negligible. Assuring the safety and well-being of a child exposed to abuse or neglect often requires DCFS to act promptly on the basis

of meager evidence. We do not doubt that significant actions, such as informing current employers of the indicated finding, often may be necessary. This is particularly true if the agency's investigation uncovers evidence that corroborates a relatively serious allegation of abuse or neglect. *Cf. Mallen*, 486 U.S. at 240. However, it is less clear, at this stage in the litigation, that the system adequately differentiates among various forms of abuse and neglect reportable under the system. In certain circumstances, the exigencies that permit disclosure of an indicated finding to prospective employers prior to an administrative hearing simply may not exist. Moreover, the pleadings indicate that DCFS does not inform employers whether an indicated employee has had an opportunity to challenge the agency's determination at an administrative hearing. On this record, the rationale for the agency's reluctance not to disclose this information is far from self-evident.

Although the initial ex parte process may prove adequate in certain circumstances, the complaints before us indicate that the system failed to provide sufficient protection for Ms. Doyle and Mr. Konold. Moreover, according to the allegations before us, Ms. Doyle's and Mr. Konold's requests for administrative hearings languished with DCFS for months. The DCFS employees have offered no explanation concerning this delay; they do not submit that it is necessary or appropriate to achieve any legitimate governmental interest. Indeed, the treatment afforded Ms. Doyle and Mr. Konold violated the state's own timetable for post-facto investigation and adjudication. Although Ms. Doyle and Mr. Konold received fairly prompt preliminary ex parte reviews, this initial phase of the appeals process offers little meaningful opportunity to challenge the allegations and proceeds under the same credible evidence standard employed during the initial

investigation. At the end of the appeals process, a hearing finally was afforded to these individuals after what appears to be, on this record, an unnecessary and burdensome delay. The largely ex parte process conducted under the credible evidence standard, when coupled with this particular delay in post-deprivation proceedings, provided insufficient process to Ms. Doyle and Mr. Konold. Because the treatment of these individuals, as stated at this initial pleading stage, did not afford an opportunity for a hearing in a meaningful time and in a meaningful manner, we must conclude that the complaint states a constitutional deprivation.

**2.**

Because we have concluded that the credible evidence standard, operating in conjunction with a belated post-deprivation hearing, failed to afford adequate process in this case, we must consider whether the DCFS employees who administered the system in this manner are entitled to qualified immunity. Under this doctrine, a government official is "shielded from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Whether an official may be held personally liable for his or her unlawful actions turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time taken." *Townsend*, 256 F.3d at 672. Before a court will deem a constitutional right clearly established, the plaintiff must demonstrate that "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Ms. Doyle and Mr. Konold submit that three cases, *Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994), *Lee TT v. Dowling*, 664 N.E.2d 1243 (N.Y. 1996), and *Cavarretta v. Department of Children and Family Services*, 660 N.E.2d 250 (Ill. App. Ct. 1996), clearly establish that the credible evidence standard failed to satisfy due process requirements in this administrative context. We often have observed that a plaintiff may overcome a claim of qualified immunity by presenting case law that "has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand." *Chan v. Wodnicki*, 123 F.3d 1005, 1007 (7th Cir. 1997). However, it is not the simple existence of analogous case law that defeats the claim of qualified immunity; rather, these decisions must demonstrate that, at the time the defendants acted, it was certain that their conduct violated the law. *See Duda v. Bd. of Educ.*, 133 F.3d 1054, 1062 (7th Cir. 1998) (indicating that the case law must "dictate" that the defendants' conduct violated the constitution). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 122 S. Ct. 2508, 2515 (2002).

In light of these principles, we cannot accept Ms. Doyle's and Mr. Konold's claims that *Cavarretta*, *Lee TT* and *Valmonte* clearly established the unconstitutionality of the credible evidence standard. For instance, in *Cavarretta*, the Illinois Appellate Court concluded that the use of the credible evidence standard at the hearing stage of the DCFS scheme failed to satisfy the mandates of due process. *See Cavarretta*, 660 N.E.2d at 258. Although Ms. Doyle and Mr. Konold urge us to interpret this case in a broader fashion, we decline to do so. The Illinois Appellate Court did not address in any definitive manner wheth-

er the use of the credible evidence standard during the initial phases of the investigation violated principles of due process. Simply put, *Cavarretta* cannot be read as an unequivocal indictment of this particular evidentiary standard.

Likewise, in *Lee TT*, the criticism that the New York Court of Appeals directed against the credible evidence standard was tempered in certain respects. In *Lee TT*, the New York Court of Appeals considered whether a child abuse reporting scheme that used the credible evidence standard violated due process requirements. *See Lee TT*, 664 N.E.2d at 1246. Although ultimately concluding that the administrative system violated constitutional mandates, the court carefully parsed its discussion of the credible evidence standard. *See id.* at 1251-52. In particular, the court observed that "[d]uring the investigative process the information [of abuse or neglect] may be retained [in the central register] on the strength of some credible evidence supporting it and disclosed to those health care and law enforcement agencies" authorized by the state legislature. *Id.* In comparison, disclosures to other entities, such as licensing agencies, must wait "until a fact finder determines after a hearing that the report is substantiated by a fair preponderance of the evidence or the subject's time to move for expunction has expired." *Id.* Far from representing a sweeping repudiation of the credible evidence standard, *Lee TT* recognized implicitly that, under the flexible concept of due process, this evidentiary standard may serve some role in an abuse and reporting scheme.

The Second Circuit's decision in *Valmonte* also does not establish that the conduct of the DCFS employees in this case violated clearly established rights. Under the New York abuse and neglect reporting scheme at issue in *Valmonte*, the State employed the credible evidence stan-

dard at each stage in its administrative framework, even during an indicated individual's administrative hearing. *Valmonte*, 18 F.3d at 1002-03. The State did not offer an indicated individual a hearing under a higher evidentiary standard as a matter of course; rather, he only could request such a hearing "*after* [he lost] an employment opportunity." *Id.* at 1002 (emphasis in original). Moreover, even if the individual prevailed at this second administrative hearing, the State did not expunge the individual's name from the register but merely sealed his file in the future. *See id.* at 1003. The Second Circuit concluded that this system proved unacceptable because the credible evidence standard permeated every aspect of the administrative process, *see id.* 1004-05, a significant difference from the system administered by the DCFS employees. Simply put, no one tested the State's case under the higher preponderance of the evidence standard as a matter of course. Rather, unlike the Illinois system, only certain events would trigger a more complete hearing, and even if the individual prevailed at this proceeding, his file only was sealed, but not expunged, from the central register. Thus, *Valmonte* did not dictate to the DCFS employees that the manner in which they administered their system violated due process.

To be sure, *Cavarretta*, *Lee TT* and *Valmonte* may cause a reasonable official to craft carefully an administrative scheme that relies upon the credible evidence standard. However, these decisions simply do not give an official "fair warning" that the manner in which the DCFS employees administered the scheme violated the clearly established rights of Ms. Doyle or Mr. Konold. *See Hope*, 122 S. Ct. at 2516. Consequently, the district courts correctly dismissed the claims against the DCFS employees alleged to have participated personally in this constitutional violation.

## C.

Two of the DCFS employees involved in the constitutional deprivation, Chief ALJs Franklin and Kennedy, raise an immunity defense distinct from that of their colleagues. More precisely, Chief ALJs Kennedy and Franklin submit that the doctrine of absolute immunity[13] shields them from suit over the docketing decisions that contributed to the constitutional deprivation. As the proponents of the doctrine's applicability, the Chief ALJs bear "the burden of showing that such immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 486 (1991).

To determine whether absolute immunity attaches to the particular conduct of a judicial officer, we employ a functional approach. *See Forrester v. White*, 484 U.S. 219, 224 (1988); *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 521 (7th Cir. 2001). In performing this inquiry, we are not concerned with the label attached to the position in question; rather, we examine the nature of the function the individual performs and the effect "that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Forrester*, 484 U.S. at 224; *Dellenbach v. Letsinger*, 889 F.2d

---

[13] "As a class judges have long enjoyed a comparatively sweeping form of immunity, though one not perfectly well-defined." *Forrester v. White*, 484 U.S. 219, 223 (1988). Termed absolute or judicial immunity, the doctrine shields members of the judiciary from liability in certain instances. *See Richman v. Sheahan*, 270 F.3d 430, 434 (7th Cir. 2001) (citing *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991)). The courts also have recognized the doctrine's applicability to government officials exercising quasi-judicial functions comparable to those of a judicial officer. *See Butz v. Economou*, 438 U.S. 478, 513-14 (1978); *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 521 (7th Cir. 2001).

755, 759 (7th Cir. 1989). When a judicial officer engages in a purely administrative function, such as terminating an employee, we are less concerned that the threat of liability will "create perverse incentives that operate to *inhibit* [the] official[ ] in the performance of [his] duties." *Forrester*, 484 U.S. at 223 (emphasis in original). In contrast, when a government official serves in a judicial or quasi-judicial capacity, the principles underlying the doctrine of absolute immunity are strongly implicated. *See, e.g., id.* at 226; *Butz v. Economou*, 438 U.S. 478, 513-14 (1978). In such a situation, the doctrine prevents officers from acting " 'with an excess of caution or otherwise . . . [that] skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their inquiry' out of a fear of litigation or personal monetary liability." *Tobin for Governor*, 268 F.3d at 522 (quoting *Forrester*, 484 U.S. at 223).

Employing this functional approach, we have determined that the scheduling of parole hearings constituted a judicial function subject to absolute immunity. *See Thompson v. Duke*, 882 F.2d 1180, 1184-85 (7th Cir. 1989). We have stressed the mere fact that scheduling was a routine activity did not render this task administrative or ministerial in nature. *See id.* Rather, as this court later noted, the "scheduling of a parole revocation proceeding[ ] is an integral part of the revocation decision itself, and functionally comparable to the decisions of a judge concerning the scheduling of a trial." *Walrath v. United States*, 35 F.3d 277, 283 (7th Cir. 1994). Indeed, as one of our sister circuits has observed, a "court's inherent power to control its docket is part of its function of resolving disputes between parties. This is a function for which judges and their supporting staff are absolutely immune." *Rodriguez v. Weprin*, 116 F.3d 62, 66 (2d Cir. 1997) (deny-

ing plaintiff's due process claim against court clerk who failed to docket appeal in a timely fashion).

In this case, we agree with the Northern District that the Chief ALJs enjoy absolute immunity from liability concerning their docketing decisions. Scheduling determinations ordinarily are a relatively routine task. This fact neither strips the scheduling decision of its judicial nature nor renders it a purely administrative function. Rather, as our discussion indicates, docketing forms an integral part of the adjudicatory process. Consequently, contrary to Ms. Doyle's and Mr. Konold's contention, the fact that neither Chief ALJ presided over their proceedings is not dispositive of this matter. Moreover, rendering an individual liable for his scheduling determinations would engender the very conduct that absolute immunity serves to prevent—decisionmakers operating with excess of caution rather than with objectivity and independence because they fear litigation. Consequently, the Northern District correctly concluded that absolute immunity bars claims against the Chief ALJs concerning their failure to afford Ms. Doyle and Mr. Konold administrative hearings in a prompt manner.

### D.

We briefly address the final claim against the remaining DCFS employees. With little elaboration, Ms. Doyle and Mr. Konold assert that they received inadequate notice of the allegations against them. In response, the DCFS employees submit that the doctrine of qualified immunity bars this claim.

We turn to the first part of this inquiry and assess whether Ms. Doyle and Mr. Konold have alleged adequately a constitutional deprivation. As previously noted, "the es-

sence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'" *Mathews*, 424 U.S. at 348-49 (Brennan, J., dissenting) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171-72 (1951) (Frankfurter, J., concurring)). A hearing has little value if, prior to the proceeding, an individual has no knowledge of the allegations against him. Thus, notice makes the hearing meaningful.

In this case, Ms. Doyle alleged that she received no formal notice from Ms. Everette-Williams concerning the indicated finding. Although Mr. Konold received a notice, it arrived belatedly and apparently contained little elaboration of the charges against him. Although we do not condone these deficiencies, the formal notice was not the only avenue through which DCFS could provide adequate notice so as to render the hearings meaningful. Both Mr. Konold and Ms. Doyle received redacted case files detailing some of the evidence against them. Prior to their respective administrative hearings, both individuals had an opportunity to examine and copy information upon which DCFS intended to rely during their proceedings. Although they did not receive adequate formal notice, the system as a whole provided both individuals with sufficient information prior to the post-deprivation proceeding to render the hearing meaningful. Consequently, the district courts correctly dismissed these claims.

## E.

Finally, we consider Ms. Doyle's and Mr. Konold's § 1983 claims against their respective former employers, Camelot and Central Baptist. In particular, Ms. Doyle and Mr. Konold submit that, functioning as state actors, these

corporate entities deprived them of a constitutionally protected right.

We need not consider whether these corporations functioned as state actors because Ms. Doyle and Mr. Konold have failed to demonstrate that either entity deprived them of a cognizable property or liberty interest. First, Ms. Doyle and Mr. Konold were at-will employees who held no protectable property interest in their respective positions. *See, e.g., Moulton v. Vigo County*, 150 F.3d 801, 804-05 (7th Cir. 1998). Indeed, in their briefs to this court, neither Ms. Doyle nor Mr. Konold submit that the actions of Camelot or Central Baptist implicated a protected property interest.

Nor may we accept their contention that the private corporations deprived them of a protected liberty interest, namely, the right to pursue the occupation of their choice. To be sure, Camelot and Central Baptist terminated Ms. Doyle and Mr. Konold. However, "any time an employee is involuntarily terminated, some stigma attaches which affects future employment opportunities. This type of harm does not infringe on an employee's protected liberty interests." *Ratliff v. City of Chicago*, 795 F.2d 612, 625 (7th Cir. 1986). Moreover, the complaints do not allege that either Camelot or Central Baptist circulated information to other employers concerning DCFS' decision to indicate Ms. Doyle and Mr. Konold. According to the allegations before us, the corporations simply did not publish defamatory statements concerning their former employees. The actions of these private entities did not call into question the "good name, reputation, honor or integrity" of Ms. Doyle and Mr. Konold in a manner that made it "virtually impossible for [them] to find new employment." *See Townsend*, 256 F.3d at 670.

We also cannot accept Ms. Doyle's and Mr. Konold's contention that the action of the corporate entities in conjunction with the conduct of the DCFS employees created the constitutional deprivation. When a plaintiff alleges that defendants have infringed upon his right to pursue the occupation of his choice, he must demonstrate that "because the charges have been made, it is unlikely that anyone will hire him for a comparable job in the future." *Townsend*, 256 F.3d at 670 n.9. In this case, the conduct of the DCFS employees, standing alone, impinged upon this protected liberty interest. The DCFS employees indicated Ms. Doyle and Mr. Konold, placed their names in the central register and then disclosed these findings. It was this conduct, standing alone, that effectively blacklisted Ms. Doyle and Mr. Konold from working in child-care services and implicated the protected liberty interest. The actions of Camelot and Central Baptist did not contribute to the constitutional deprivation that occurred in this case. Consequently, the district court correctly dismissed the claims against Camelot and Central Baptist.

## Conclusion

Although we conclude that the credible evidence standard, operating in conjunction with a belated post-deprivation hearing, failed to afford adequate process to Ms. Doyle and Mr. Konold, the district courts properly dismissed the claims against the various DCFS employees. The doctrine of absolute immunity barred the claims against Chief ALJ Franklin and Chief ALJ Kennedy. The remaining DCFS employees were entitled to qualified immunity for their respective roles in the administration of this system. In addition, the district courts properly dismissed Ms. Doyle's and Mr. Konold's inadequate notice claims.

Finally, Ms. Doyle and Mr. Konold have failed to allege adequately that their former employers deprived them of a protected liberty interest. As such, the district courts properly dismissed the due process claims against Camelot, Central Baptist and Hudelson. Accordingly, the judgments of the district courts are affirmed.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*