Megan WAGNER, by her next
friend, Debra WAGNER–
GARAY, Plaintiff,

v.

FORT WAYNE COMMUNITY
SCHOOLS, Kenneth Howe, and Joyce
Turner, Defendants.

No. 1:02–CV–82.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

March 19, 2003.

John F. Lyons, Barrett and McNagny, Fort Wayne, IN, for mediator.

W. Randall Kammeyer, Hawk Haynie Gallmeyer and Chickedantz, Fort Wayne, IN, for plaintiff.

Wendy W. Davis, Matthew J. Elliott, Beckman, Lawson, Sandler, Snyder and Federoff, Fort Wayne, IN, for defendant.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, Magistrate Judge.

### I. INTRODUCTION

The Plaintiff, Megan Wagner ("Wagner"), by her next friend, Debra Wagner–Garay ("Wagner–Garay"), brings this civil rights action against Fort Wayne Community Schools ("FWCS"), challenging its decision to expel her from Lane Middle School ("Lane") for bringing caffeine pills to school and distributing them to other students. Specifically, Wagner raises 14th Amendment procedural and substantive due process and equal protection claims under 42 U.S.C. § 1983 (" § 1983"), and a state law defamation claim against Lane's principal, Kenneth Howe ("Howe"), and assistant principal, Joyce Turner ("Turner").[1]

Presently before the Court[2] is the Defendants' motion for summary judgment filed on January 9, 2003. Because the Defendants' memorandum in support of that motion relies on the affidavit of Judith Platz ("Platz") ("Platz Aff. at ——") to introduce various documents related to, and relied on during Wagner's expulsion hearing, Wagner filed a motion to strike the affidavit as unsupported by Platz's personal knowledge and containing inadmissible hearsay.[3] The motion for summary

---

1. We will refer to FWCS, Turner, and Howe collectively as the "Defendants."

2. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

3. Wagner also asks the Court to strike the Defendants' Memorandum in Support of their Motion for Summary Judgment because any arguments raised are inextricably intertwined with Platz's affidavit.

judgment and the motion to strike have been fully briefed and are ripe for ruling.[4]

The record consists of the Wagner's Affidavit ("Pl.Aff.¶ ——"), the affidavit of Kara Bertram ("Bertram Aff. ¶ ——"), Howe's deposition ("Howe Dep. at ——"); Turner's deposition ("Turner Dep. at ——"), the Expulsion Hearing transcript ("Tr. at ——"), FWCS's Behavior Code ("Behavior Code at ——"), and other documents.

For the following reasons, the motions to strike will be DENIED, and the Defendants' motion for summary judgment will be GRANTED.

## II. THE MOTION TO STRIKE

In her motion to strike, Wagner seeks to strike Platz's affidavit and, by extension, all or parts of the Defendants' memorandum in support of their motion for summary judgment. Stripped to its essence, Platz's affidavit introduces into evidence 18 FWCS documents, including student statements relied on during the expulsion hearing, various letters notifying Wagner of the charges against her, the transcript of the expulsion hearing, and Platz's decision recommending expulsion.

First, Wagner claims that Platz's affidavit should be stricken because she did not prepare several of the attached exhibits, and they are otherwise outside the scope of her personal knowledge.

Fed.R.Civ.P. 56(e) provides that "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). To be based on personal knowledge, Platz's affidavit testimo-

ny must be "grounded in [her] observation or other first-hand personal experience." *Visser v. Packer Eng'g Assoc., Inc.,* 924 F.2d 655, 659 (7th Cir.1991); *E.E.O.C. v. Admiral Maintenance Service, L.P.,* 174 F.R.D. 643, 647 (N.D.Ill.1997).

Here, Platz's affidavit is clearly "grounded in" her observations and first-hand personal knowledge. Indeed, Platz served as the hearing officer at Wagner's expulsion hearing, and in that capacity meticulously documented, in her written decision, the evidence offered at the hearing. Moreover, Platz is certainly competent to testify about the expulsion hearing transcript given that she conducted the hearing. Thus, because Platz was present at the expulsion hearing and because she documented the evidence offered there, her affidavit is clearly based on first-hand knowledge.[5]

Nevertheless, the apparent gravamen of Wagner's motion to strike lies with the hearsay statements contained in these documents, including the expulsion hearing transcript itself. Indeed, Wagner cites to a few cases that generally stand for the proposition that an affidavit must present admissible evidence, and reasons that "Platz would not be able to testify as to the hearsay portions of the expulsion hearing [and other exhibits] and accordingly should not be able to introduce them into evidence through affidavit[.]" (Pl.'s M. to Strike at 2.)

■ However, this argument evidences a fundamental misunderstanding of the Court's role (and apparently Platz's role, too) as well as the procedural posture of this case. More precisely, Wagner complains that the expulsion hearing violated her due process rights, but wants us to

4. No reply brief on the motion to strike has been filed and the time to do so has passed.

5. Wagner also makes a passing argument that certain documents attached to Platz's affidavit

are unauthenticated. However, Platz testifies to their truth and accuracy, which is all that is required. *See* Fed.R.Evid. 901(b)(2) ("[t]estimony that a matter is what it is claimed to be" is sufficient authentication).

ignore what was said and done there, apparently in favor of a new expulsion hearing governed by the Federal Rules of Evidence, replete with formalistic trappings. But " § 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings." *Wood v. Strickland*, 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *see also Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir.1993) (due process does not require the judicializing of school disciplinary proceedings). Moreover, as we shall see *infra*, due process does not require laymen conducting an expulsion hearing to abide by such evidentiary rules. *See Boykins v. Fairfield Bd. of Ed.*, 492 F.2d 697, 701 (5th Cir.1974) ("the rights at stake in a school disciplinary hearing may be fairly determined upon the 'hearsay' evidence of school administrators charged with the duty of investigating the incidents. We decline to place upon a board of laymen the duty of observing and applying the common-law rules of evidence.").[6]

Accordingly, because Platz's affidavit is based on personal knowledge and because any hearsay statements contained in the expulsion hearing transcript and related documents do not provide a basis for exclusion, the Plaintiff's motion to strike will be denied.

## III. PROCEDURAL AND FACTUAL BACKGROUND[7]

In April 2001, Wagner, a seventh grader at Lane, observed her grandfather taking some pills and asked him what they were. (Wagner Aff. ¶ 2, 4; Tr. at 30). He explained that they were caffeine pills which helped keep him awake and alert.[8] (Wagner Aff. ¶ 4; Tr. at 30). Later, Wagner took some of these caffeine pills from her grandfather's home without permission. (Wagner Aff. ¶ 5; Tr. at 2, 4, 10, 14–15).

On April 9, 2001, Wagner brought the pills to school, where she ingested one herself, apparently to help stay awake and focused in class.[9] (Wagner Aff. ¶ 5; Tr. at 2, 4, 10, 14–16). Other students quickly learned about Wagner's pills, and between April 9–10 she distributed them to eight other students who, she claims, came to her and asked for them. (Bertram Aff. ¶ 3, 5; Platz Aff., Ex. 9, 11; Tr. at 7.) Nevertheless, at least some of the student

---

6. Wagner also claims the Defendants' Memorandum in Support of their Motion for Summary Judgment should be stricken because it is so closely intertwined with Platz's affidavit. However, because we conclude that Platz's affidavit is properly before the Court, this argument is without merit. Further, Wagner asks the Court to strike the Defendants' reference to the fact that a student visited the emergency room as unsupported and prejudicial. However, during the expulsion hearing, Wagner herself testified about the student who visited the emergency room, so this evidence is certainly supported by the record. (*See* Tr. at 7–8.) As for Wagner's apparent Fed.R.Evid. 403 claim that this evidence should be excluded as prejudicial, we note that prejudice alone is insufficient to justify exclusion, after all, any evidence that tends to support FWCS's case is prejudicial to Wagner. *See United States v. Guyton*, 36 F.3d 655, 660 (7th Cir.1994). Rather, to warrant

exclusion under Rule 403, the evidence must be *unfairly* prejudicial. *Id.* But here, this highly relevant evidence will not lure the factfinder into losing sight of the main issues, *see Hicks v. Mickelson*, 835 F.2d 721, 726 (8th Cir.1987) (evidence is unfairly prejudicial if it would cause "the jury to lose sight" of the main issues), or suggest a decision on an improper basis. *See* Advisory Committee Notes to Rule 403.

7. The following recitation is drafted in a light most favorable to Wagner

8. The caffeine pills were "Maximum Strength Stay Awake" brand, each containing 200 milligrams of caffeine. (*See* Platz Aff., Ex. 13 at 2.)

9. Wagner evidently thought the caffeine pills would help control Attention Deficit Disorder ("ADD"). (Tr. at 14; Platz Aff., Ex. 12.)

statements obtained by FWCS suggest that Wagner approached them about the pills. (*See* Platz Aff., Ex. 5 ("[Wagner] came to my locker and said she had caffeine pills."); Ex. 6 ("[Wagner] asked me to take this [pill]"); Ex. 7 ("[Wagner] said she had some pills. So I took one.")).

However, things soon soured because early on April 11, a concerned parent approached Turner, and explained that her daughter had experienced symptoms including a rapid heartbeat, shaking, muscle tension, an upset stomach, and nausea after taking one of Wagner's pills. (Tr. at 2, 18; Turner Dep. at 18–19.) After receiving this phone call, Turner immediately began an investigation. (Turner Dep. at 19–20.)

A short time later, Howe received a phone call from another upset parent, whose daughter went to the emergency room after experiencing a rapid heart beat, apparently brought about by one of Wagner's pills. (Tr. at 7, 19, 25.) According to the parent, the doctor stated that if the girl had taken another pill, she might have gone into cardiac arrest. (Tr. at 25.)

In the meantime, Turner searched Wagner's locker, confiscated the caffeine pills, and questioned Wagner, who admitted distributing the pills. (Turner Dep. at 19–20). In a written statement, Wagner specifically identified the students who received pills from her, and noted that she refused to give the pills to at least one student who she felt could stay awake in class. (Platz Aff., Ex. 11.) Wagner also wrote that she gave another student a pill "because last year [that student] had ADD." (*Id.*) According to Wagner, that

student "thought she would get high but she didn't." (*Id.*) In fact, Wagner indicated that all the students who took the pills "wanted a feeling," but she told them that "they wont [sic] get high like they think they will." (*Id.*)

As a result of the investigation, FWCS suspended Wagner for five days, and sought to expel her until the end of the fall term of 2001 for violating Rule 31 of the student Behavior Code, which prohibits the improper use of drugs, including over-the-counter medication.[10] (Platz Aff., Ex. 15–18.) After receiving notice of the charges, Wagner appeared at an expulsion hearing before Platz on April 25, 2001, with FWCS represented by Turner, and Wagner represented by counsel. (Tr. at 1.)

Once the hearing proceeded, Turner summarized FWCS's investigation and read into the record the statements of six students who took the caffeine pills. Counsel for Wagner cross-examined Turner, presented evidence on behalf of Wagner, submitted 11 letters from various individuals attesting to Wagner's character, and generally argued Wagner's case. Wagner testified that she took a total of two caffeine pills without ever thinking they were over-the-counter medication, never solicited students about the pills, only gave one pill to each of the various students who took them, and refused to provide pills to certain students. (Tr. at 6–8, 15.)

Based on the evidence presented, Platz determined that Wagner should be expelled until the end of the fall semester of

---

**10.** FWCS's Behavior Code divides its disciplinary rules into three general categories: "Attendance Violations," "Behavior Violations," and "Law Violations." Rule 31, which is classified as a Law Violation, prohibits "[p]ossession, use, [being] under the influence, and/or sale of narcotics and drugs such as steroids, marijuana, barbiturates, amphetamines, alcoholic beverages, intoxicants, inhalants, or any substance which is represented to be a narcotic/drug or alcoholic beverage. This includes paraphanalia and *improper use of over-the-counter medications.*" (Behavior Code at 13) (emphasis added).

2001 (i.e., until approximately January 18, 2002), and in order to be considered for any educational programs during the fall semester, Wagner must complete 15 hours of community service, have an assessment for substance abuse, and enroll in counseling by June 1, 2001. (Platz Aff., Ex. 13, Expulsion Examiner's Written Summary of Evidence; Determination and Notice of Action Taken, at 7.)

Wagner timely appealed to Jerry White, the Superintendent/Designee, who modified her expulsion to allow her to return for the fall term of 2001 if she completed the community service and enrolled in substance counseling by June 1, 2001. (Platz Aff., Ex. 14, Notice of Appeal Decision.)

As for the students who consumed Wagner's pills, FWCS suspended them from school for three days, (Howe Dep, Exs. 1–9), and barred them from participating in extracurricular activities or school trips through the end of the semester, required them to change their lunchroom seating, ordered them to take a drug awareness class, and placed them on probation. (Turner Dep. at 25–26). Despite these limitations, Lane has apparently not barred at least one offending student from extracurricular activities or forced her to attend drug counseling. (Bertram Aff. ¶ 8.)

In this case, Wagner contends the Defendants violated her substantive due process rights by expelling her for a so-called "Law Violation" under the student Behavior Code even though there was no violation of Indiana law. Wagner also claims that Rule 31 is unconstitutionally vague because it does not specifically list caffeine as an over-the-counter medication or attempt to define "improper use." She next argues that FWCS violated her procedural due process rights by refusing to provide her with the names of her anonymous accusers and the documents relied upon at the expulsion hearing, and by refusing to

allow her to introduce evidence that Lane permitted the unrestricted sale of soft drinks with "similar levels of caffeine." (Pl.'s Resp. at 10.) Finally, Wagner claims FWCS violated her equal protection rights by punishing her more severely than the other students who consumed the pills.

The Defendants contend there was no substantive due process violation because FWCS is entitled to construe its own Behavior Code. They also maintain that Rule 31 is not unconstitutionally vague as applied to Wagner because FWCS need not define every term in that rule with exactitude. Additionally, the Defendants argue that Wagner's rights were not violated because she possessed no due process right to learn the identities of her accusers, or cross-examine them, either at or before an expulsion hearing. As for the presence of soft drinks at Lane, FWCS contends that this is simply irrelevant to the issues in the expulsion hearing. Next, the Defendants claim FWCS's differential treatment of Wagner did not violate her equal protection rights because she endangered others by distributing the pills. Finally, the Defendants claim that Wagner has no evidence with which to make out her defamation claims against Howe and Turner, and that, to the extent she raises a distinct claim under IND. CONST. art. 8, § 1, it is not recognized under Indiana law.

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v.*

*Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 2512, 106 S.Ct. 2505; *North Am. Van Lines, Inc. v. Pinkerton Sec. Sys., Inc.,* 89 F.3d 452, 455 (7th Cir.1996); *In Re Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553, 106 S.Ct. 2548. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.1983), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983); *Guenin v. Sendra Corp.,* 700 F.Supp. 973, 974 (N.D.Ind. 1988). In ruling on a summary judgment motion, the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence nor the credibility of witnesses. *Anderson,* 477 U.S. at 249–51, 106 S.Ct. at 2511, 106 S.Ct. 2505; *North Am. Van Lines, Inc.,* 89 F.3d at 455. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Ill. Nat'l Bank,* 704 F.2d 361, 367 (7th Cir. 1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed. R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *First Nat'l Bank of Cicero v. Lewco Sec. Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252, 106 S.Ct. at 2512.

## V. DISCUSSION

### A. The Substantive Due Process Claim[11]

The touchstone of the Fourteenth Amendment's due process clause is the "protection of the individual against arbitrary action of government." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 1716, 140 L.Ed.2d 1043 (1998). However, the appropriate standard for analyzing a substantive due process claim depends on whether "legislation or a specific act of a governmental officer is at issue." *Dunn v. Fairfield Community High School Dist. # 225*, 158 F.3d 962, 965 (7th Cir.1998).

■ When, the focus, as here, is on legislation (or more accurately, regulation), the Court must decide whether it interferes with "certain fundamental rights and liberty interests." *Id.* at 966 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997)). The Supreme Court has already decided that a student's interest in education is not a fundamental right. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *see also Dunn*, 158 F.3d at 966 ("Although students may have some substantive due process rights while they are in school ... education itself is not a fundamental right."). Thus, the legislation (or regulation) will be upheld if it has "a reasonable relation to a legitimate state interest," *Glucksberg*, 521 U.S. at 722, or as the Seventh Circuit states somewhat differently, it will be upheld "unless it is wholly arbitrary," or an "extraordinary departure from established norms." *Dunn*, 158 F.3d at 966.

In this case, Wagner claims FWCS's Behavior Code is arbitrary because it punishes "Law Violations" even when no law was actually violated. (Pl.'s Resp. at 6.) Specifically, Wagner argues that because Rule 31 falls under what FWCS chose to generally describe as "Law Violations," it must necessarily follow that there must be some transgression of a local, state, or federal law before the rule can be the basis for an expulsion.

■ However, FWCS is clearly entitled to considerable discretion in construing its disciplinary rules. *See Wood*, 420 U.S. at 326, 95 S.Ct. 992 (" § 1983 does not extend the right to relitigate in federal court ... the proper construction of school regulations."); *Board of Educ. of Rogers, Arkansas v. McCluskey*, 458 U.S. 966, 970, 102 S.Ct. 3469, 73 L.Ed.2d 1273 (1982). Indeed, in *Wood*, the Eighth Circuit interpreted a school regulation's use of the term "intoxicating beverages," as being "linked" to a state statute defining "intoxicating liquor." *Wood*, 420 U.S. at 324, 95 S.Ct. 992. However, in rejecting this interpretation, the Supreme Court noted that "[t]estimony at trial ... established convincingly that the term 'intoxicating beverage' in the school regulation was not intended at the time of its adoption ... to be linked to the definition in the state statutes or to any other technical definition of 'intoxicating.'" *Wood*, 420 U.S. at 324, 95 S.Ct. 992. Thus, the Supreme Court concluded that courts are "ill advised to supplant the interpretation of the regulation[s] of those officers who adopted [them] and are entrusted with [their] en-

---

11. Because this Court has previously addressed many of the issues raised by Wagner, this section is largely modeled after the Court's unpublished summary judgment order in *In re the Matter of B.S. v. Fort Wayne Community Schools*, 1:02–CV–349 (Jan. 3, 2003).

forcement." *Wood,* 420 U.S. at 325, 95 S.Ct. 992.[12]

■ Nevertheless, Wagner attempts to support her claim by noting that while Rules 13–36 of the Behavior Code are all termed "Law Violations," an introductory statement to Rules 27–36 provides that "[t]he following violations will result in school consequences and *the police department and FWCS Security department to be notified.*" (Behavior Code at 13) (emphasis added). Wagner believes that requiring police notification means that criminal behavior is a prerequisite for a "Law Violation."

However, this ignores the facts and reasoning of *Wood* and *McCluskey.* Indeed, Wagner apparently would have this Court apply some sort of legal gloss to a simple school behavioral code violation, a contention rejected by the Supreme Court in *Wood* and *McCluskey.* Further, Turner actually notified the police regarding Wagner's distribution of caffeine pills to other students, in compliance with the introductory statement to Rules 27–36. That the police chose not to pursue the matter further does not mean that Wagner did not violate the Behavior Code. Indeed, her behavior potentially endangered the lives of two of her fellow students and was disruptive to the educational system itself.

In short, FWCS was entitled to construe its own regulations, and it has not done so unreasonably or arbitrarily in this case. The Behavior Code provides FWCS with the authority to expel a student for improper use of over-the-counter medication, and certainly the unchecked distribution of potent caffeine pills falls into that category. At worst, FWCS's classification of Rule 31 as a "Law Violation[ ]" is somewhat misleading, however, "[i]t is not the role of federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." *Wood,* 420 U.S. at 326, 95 S.Ct. 992.

Moreover, neither Rule 31 nor Wagner's expulsion under that rule amount to "an extraordinary departure from established norms." *Dunn,* 158 F.3d at 966. Rule 31 is a reasonable attempt to prohibit disruptive and potentially dangerous conduct. Wagner freely admitted distributing caffeine pills to several students who wanted "a feeling" or "to get high," and this resulted in two students suffering serious health consequences. That Wagner apparently did not realize the risk involved with the unmonitored distribution of caffeine pills only reinforces the need for Rule 31 and for leaving the distribution of medication at school to the nursing staff.

Accordingly, we will grant the Defendants' motion for summary judgment on the Plaintiff's substantive due process claim.

## B. The Void for Vagueness Claim

■ The void for vagueness doctrine rests on the due process principle that a law is unconstitutional "if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Karlin v. Foust,* 188 F.3d 446, 458 (7th Cir.1999). Since Rule 31 does not reach constitutionally protected conduct, to succeed on her vagueness challenge, Wagner must show that Rule 31 is impermissibly vague as applied to her. *Village of Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 497, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Fuller v. Decatur Public School Bd. of Educ., School Dist. 61,* 251

---

12. Similarly, in *McCluskey,* the Supreme Court, relying on *Wood,* held that the school board was free to interpret the term "drugs," as used in the school regulations, to include alcohol. *McCluskey,* 458 U.S. at 970–71, 102 S.Ct. 3469.

F.3d 662, 667 (7th Cir.2001). "Worth noting, however, is that flexibility or breadth should not necessarily be confused for vagueness. 'There is little doubt that imagination can conjure up hypothetical cases in which the meaning of [disputed] terms will be in nice question.'" *Wiemerslage Through Wiemerslage v. Maine Tp. High School Dist. 207,* 29 F.3d 1149, 1151 (7th Cir.1994) (quoting *American Communications Ass'n v. Douds,* 339 U.S. 382, 412, 70 S.Ct. 674, 94 L.Ed. 925 (1950)).

A vagueness challenge must be considered in the context of the rule at issue. *Id.* As framed by the Supreme Court, the inquiry is whether the rule defines the proscribed conduct "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *see also Roberts v. United States Jaycees,* 468 U.S. 609, 629, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (a rule must contain a "reasonable degree of clarity" so that people of "common intelligence" can understand its meaning); *Fuller,* 251 F.3d at 666; *Gresham v. Peterson,* 225 F.3d 899, 907 (7th Cir.2000). However, given the many difficult issues facing school administrators, a school's disciplinary rules need not be drafted as narrowly or with the same precision as criminal statutes. *See Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 686, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986); *Fuller,* 251 F.3d at 667; *Wiemerslage,* 29 F.3d at 1152.

In this context, the parties argue about whether the phrase "over-the-counter medication," as used in Rule 31, is unconstitutionally vague. FWCS argues that a person of ordinary intelligence would understand *caffeine pills* to be an over-the-counter medication. Wagner, in turn, rephrases the issue and claims that a person of ordinary intelligence would not think that *caffeine* itself is an over-the-counter medication, an interpretation she claims is supported by the fact that Lane permits the unregulated sale of soft drinks. However, the relevant inquiry is not whether caffeine, a naturally occurring substance in some foods and an additive in soft drinks, is an over-the-counter medication, rather it is whether the caffeine pills at issue here fit that description.

In this regard, the parties squabble, with dueling dictionaries in hand, about whether caffeine pills constitute over-the-counter medication. However, this debate seems unnecessary given that even the federal government views these caffeine pills as "over-the-counter stimulant drug[s.]" *See* 21 C.F.R. § 340.1–50. Moreover, Wagner herself apparently understood the pills to have some medicinal qualities because in addition to keeping her alert, she thought they would help with one student's ADD, (Platz's Aff., Ex. 11), and another's headache. (Platz's Aff., Ex. 4.) Finally, common sense dictates that caffeine pills amount to over-the-counter medication, after all, they are sold alongside other non-prescription pharmaceutical products in various drug stores, department stores, and even truck stops, and, by law, their packaging must contain, as the pills in question apparently did, (*see* Tr. at 6), an FDA warning that "too much caffeine may cause nervousness, irritability, sleeplessness, and, occasionally, rapid heart beat." 21 C.F.R. § 340.50.

Nevertheless, Wagner suggests that Rule 31 is void for vagueness because it does not list each and every over-the-counter medication. However, this level of articulation is not required, nor is it particularly practical or effective, given FWCS's "need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational pro-

cess." *Fraser,* 478 U.S. at 686, 106 S.Ct. 3159.

The parties next split hairs over the term "improper use," Wagner declaring it unconstitutionally vague since it is not specifically defined in the Behavior Code. However, as discussed *supra,* this level of detail is not constitutionally required of a school's disciplinary code. *Id.* Moreover, a person of reasonable intelligence, even a reasonably intelligent thirteen year-old, would certainly understand that the distribution of maximum strength caffeine pills to students who want "a feeling" or "to get high," is an improper use, regardless of whether the pills could meet those desires. Further, even if the pills are used as recommended, the unsupervised distribution of them by a student is clearly improper; students should not play doctor by diagnosing and medicating other students in a school setting, particularly since both students are likely to be unfamiliar with the likelihood of allergic reactions or caffeine sensitivity.

Accordingly, because the sanctioned conduct falls comfortably within Rule 31, Wagner's void for vagueness claim fails.

## C. The Procedural Due Process Claim

The Fourteenth Amendment prohibits the Defendants and other state actors from depriving "any person of life, liberty, or property, without due process of law," U.S. CONST. amend. XIV, § 1, and the task here is to determine whether the Defendants violated that provision. *Doyle v. Camelot Care Centers, Inc.,* 305 F.3d 603, 616 (7th Cir.2002).

Indeed, there is no dispute that Wagner has a property interest in her free public education, *see Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), *Martin v. Shawano–Gresham School Dist.,* 295 F.3d 701, 705-06 (7th Cir.2002); IND. CONST. art. 8, § 1 ("it shall be the duty of the General Assembly ... to provide, by law, a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all."), so we turn to the question of how much process she was due. *See Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) ("[o]nce it is determined that due process applies, the question remains what process is due.").

In *Goss v. Lopez,* the United States Supreme Court first addressed what process is due in the school discipline context. Although *Goss* specifically limited its holding "to the short suspension, not exceeding 10 days," *Goss,* 419 U.S. at 584, 95 S.Ct. 729, it "nevertheless establish[ed] the *minimum* requirements for long-term expulsions as well." *Newsome v. Batavia Local School Dist.,* 842 F.2d 920, 927 (6th Cir. 1988) (emphasis in original). Thus, the Seventh Circuit has held that to comport with due process, suspension and expulsion procedures must provide the student with a meaningful opportunity to be heard. *Remer v. Burlington Area School Dist.,* 286 F.3d 1007, 1010–11 (7th Cir.2002) (citing *Linwood v. Bd. of Educ.,* 463 F.2d 763, 769–70 (7th Cir.1972)). The proceedings need not, however, take the form of "a judicial or quasi-judicial trial;" so long as the student is given notice of the charges against [her], notice of the time of the hearing and a full opportunity to be heard, the expulsion procedures do not offend due process requirements. *Id.; see also Goss,* 419 U.S. at 581, 95 S.Ct. 729 (minimum due process requirements for suspension include "oral or written notice of the charges ... and, if [s]he denies them, an explanation of the evidence the authorities have against [her] and an opportunity to present [her] side of the story.").

Wagner concedes that she received adequate notice of the charges and the hearing, but contests whether she received a full opportunity to be heard because she

was unable to confront and cross examine witnesses, and because Platz refused to let her present evidence regarding the sale and consumption of caffeinated soft drinks at Lane.

To determine whether Wagner received a full opportunity to be heard, we must apply the flexible, policy-oriented balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *See Newsome*, 842 F.2d at 923–24; *Caston v. Benton Public Schools*, 2002 WL 562638, *3 (E.D.Ark. April 11, 2002); *Rippy v. Bd. of Sch. Trustees*, 2000 WL 689340, *3 (S.D.Ind. Feb.4, 2000). In *Mathews*, the Supreme Court explained that courts must consider (1) the private interest that will be affected by the state action, (2) the risk of an erroneous deprivation of this private interest through the procedures used by the state, and the probable value, if any, of additional or substitute procedural safeguards, and (3) the government's interest, including the function involved and the fiscal and administrative burdens that an additional or alternative procedure would entail. *Mathews*, 424 U.S. at 335, 96 S.Ct. 893.

As to the first *Mathews* factor, there is no dispute that Wagner has an important interest at stake in this case. Indeed, her expulsion may "seriously damage [her] standing with [her] fellow pupils and [her] teachers as well as interfere with later opportunities for higher education and employment." *Goss*, 419 U.S. at 575, 95 S.Ct. 729. Therefore, we conclude that Wagner has a strong interest in ensuring that her expulsion was warranted.

However, the second *Mathews* factor, the risk of an erroneous deprivation of that interest through the procedures employed, is very low and weighs in favor of the Defendants. Wagner first complains that FWCS refused her the name of her accusers, and the opportunity to cross examine them. Indeed, she claims that without

such information and opportunity, FWCS made out its case against her through unsubstantiated hearsay.

■ However, the clear weight of authority holds that a student facing an expulsion hearing does not have the right to cross-examine witnesses or even learn their identities, and the school may rely on hearsay evidence. *See, e.g., Newsome*, 842 F.2d at 925; *Brewer ex rel. Dreyfus v. Austin Independent School Dist.*, 779 F.2d 260, 263 (5th Cir.1985); *Boykins*, 492 F.2d at 701("the rights at stake in a school disciplinary hearing may be fairly determined upon the 'hearsay' evidence of school administrators charged with the duty of investigating the incidents. We decline to place upon a board of laymen the duty of observing and applying the common-law rules of evidence."); *Tasby v. Estes*, 643 F.2d 1103, 1106 (5th Cir.1981) ("rights in a student disciplinary hearing may properly be determined upon the hearsay evidence of school administrators who investigate disciplinary infractions."); *Caston*, 2002 WL 562638; *Witvoet v. Herscher Comm. Unit School Dist. No. 2*, 1998 WL 1562916, *4 (C.D.Ill. May 27, 1998); *Smartt v. Clifton*, 1997 WL 1774874, *16 (S.D.Ohio Feb.10, 1997); *L.Q.A. ex rel. Arrington v. Eberhart*, 920 F.Supp. 1208, 1219 (M.D.Ala.1996), *aff'd* 111 F.3d 897 (11th Cir.1997); *Coplin v. Conejo Valley Unified School Dist.*, 903 F.Supp. 1377 (C.D.Cal.1995). This conclusion stems from the recognition that while the "value of cross-examination to the discovery of truth cannot be overemphasized," in the school discipline context,

> [t]he value of cross-examining student witnesses ... is somewhat muted by the fact that the veracity of a student account of misconduct by another student is initially assessed by a school administrator ... who has, or has available to him, a particularized knowledge of the

student's trustworthiness.... Consequently, the process of cross-examining the student witness may often be merely duplicative of the evaluation process undertaken by the investigating school administrator.

*Newsome,* 842 F.2d at 924.

Nevertheless, Wagner attempts to overcome this virtual mountain of case law by citing to a single Illinois Appellate Court case which ostensibly rejects *Newsome* and its progeny, albeit without referring to those cases by name. *See Colquitt v. Rich Township High School Dist. No. 227,* 298 Ill.App.3d 856, 232 Ill.Dec. 924, 699 N.E.2d 1109, 1116 (1998). However, *Colquitt* is not binding on this Court, and we do not find its out-of-hand rejection of the reasoning in *Newsome* persuasive.[13]

In this case, the school administrators were required to assess the veracity of those students who submitted statements, *see Newsome,* 842 F.2d at 924, and the Defendants did not err in preventing the Plaintiff from cross-examining them or by reading their statements into the record. Indeed, both Turner and Howe certainly had particularized knowledge of the trustworthiness of those students, since they knew them either firsthand, or through school records, such as their "disciplinary history, which can serve as a valuable gauge in evaluating the believability of [their] account." *Id.* Moreover, the school

administrators' assessment was obviously reinforced by the consistency of the students' stories. Accordingly, we think it clear that the Defendants had an adequate opportunity to assess the students' knowledge and trustworthiness.

Finally, Wagner complains that Platz prevented her from presenting evidence that caffeinated soft drinks are sold at Lane without regulation. However, Platz had the discretionary authority to direct the scope of the hearing to relevant matters, and she appropriately exercised that discretion by focusing Wagner's attorney on the relevant issues, i.e., whether Wagner violated Rule 31 of the Behavior Code by ingesting potent caffeine pills and distributing them to other students.[14] *Osteen v. Henley,* 13 F.3d 221, 225 (7th Cir.1993) ("[the hearing officer's] interruption, designed to confine the proceeding to relevant matters, was well within the outer bounds of the presiding officer's discretionary authority over the scope of the hearing—and it is the outer bounds that due process controls.")

Thus, under the *Mathews* framework, the risk of an erroneous deprivation of Wagner's interests was very low.

Turning to the third *Mathews* factor, we must weigh the value of providing Wagner with the names of her undisclosed accusers, their statements, and the opportunity

---

**13.** In fact, it is questionable how persuasive even the Illinois courts have found *Colquitt* given that none have cited it for this proposition.

**14.** While Platz did not err in rejecting this argument and evidence, it would not have helped Wagner even if she had allowed it. For example, a 12 or 13 year old student over time would have to consume approximately five (5) twelve-ounce cans of Dr. Pepper, or three and one half (3½) cans of Mountain Dew, to get the same amount of caffeine they would get instantly from just one of Wagner's pills. *See* National Soft Drink Association,

*Caffeine Content of Soft Drinks,* at www.nsda.org/WhatsIn/ caffeinecontent.html (visited March 18, 2003). It is this immediate jolt of caffeine that presents a serious potential for harm, evidenced here by the students who experienced rapid heart beats after consuming the pills, a concern generally not associated with the usual adolescent consumption of caffeinated beverages. Moreover, the sale and consumption of caffeinated beverages in a student cafeteria or lounge is something school authorities can ultimately monitor and control, as opposed to the clandestine distribution of pills in a hallway or classroom.

to cross-examine them, against the burden that such practices would place on the school administration. *Mathews,* 424 U.S. at 335, 96 S.Ct. 893; *Newsome,* 842 F.2d at 924. As several courts have previously noted, in light of the increasing challenges schools face in maintaining order and discipline, requiring schools to permit the confrontation of student witnesses or even to disclose their identities in expulsion hearings would be overly-burdensome and unrealistic. *See Newsome,* 842 F.2d at 924–25; *Caston,* 2002 WL 562638, \*5; *Coplin,* 903 F.Supp. at 1382; *Graham v. Knutzen,* 351 F.Supp. 642, 669 (D.Neb.1972). The purpose behind the administrative expulsion process, and the expulsion hearing itself, is to avoid the formalistic trappings and cost of adversarial litigation. *Osteen,* 13 F.3d 221, 225–26 (7th Cir.1993); *Gorman v. University of Rhode Island,* 837 F.2d 7, 16 (1st Cir.1988); *see cf., Remer,* 286 F.3d at 1010–11 (expulsion proceedings need not take the form of "a judicial or quasi-judicial trial"). It merely states the obvious to suggest that formalized disciplinary proceedings would increase cost and complexity,

> to the detriment of discipline as well as ... [FWCS's] fisc. Concern is frequently voiced about the bureaucratization of education, reflected for example in the high ratio of administrative personnel to faculty at all levels of American education today. We are reluctant to encourage further bureaucratization by judicializing ... disciplinary proceedings, mindful also that one dimension of academic freedom is the right of academic institutions to operate free of heavy-handed governmental, including judicial, interference.

*Osteen,* 13 F.3d at 225–26

Furthermore, FWCS has a strong interest in protecting students who report classmate misconduct. "Those students may be understandably reluctant to come forward with information if they are faced with the prospect of formal cross-examination by the offending student or his attorney," *Caston,* 2002 WL 562638, at \*5, or the unsettling prospect of ostracism or even physical reprisals at the hands of their peers. *Id.; Newsome,* 842 F.2d at 925 ("[w]ithout the cloak of anonymity, students who witness [misconduct] will be much less likely to notify school authorities, and those who do will be faced with ostracism at best and perhaps physical reprisals."); *Graham,* 351 F.Supp. at 666 ("students who give information ... are often the subject of reprisal from students about whom information was given.").

Thus, in balancing the various *Mathews* factors, the Defendants' interests in avoiding administrative burdens associated with more formalized expulsion proceedings and protecting student witnesses greatly outweigh the little value derived from providing Wagner with names of her accusers, their written statements, and the opportunity to cross-examine them or to delve into irrelevant matters. "The question presented here is not whether the hearing was ideal, or whether its procedure could have been better. Rather, in all cases, the inquiry is whether, under the particular circumstances presented, the hearing was fair, and accorded the individual with the essential elements of due process." *Gorman,* 837 F.2d at 16. We conclude, based on the facts in this case, that the Defendants afforded Wagner with a full and fair opportunity to be heard.

Accordingly, we will grant the Defendants' motion for summary judgment on Wagner's procedural due process claim.

### D. The Equal Protection Claim

An equal protection violation occurs only when different legal standards are arbitrarily applied to similarly situated individuals. *Smith v. Severn,* 129 F.3d 419, 429 (7th Cir.1997). In analyzing an equal pro-

tection claim, courts focus on whether a plaintiff was denied a fundamental right or treated differently than other persons because of her membership in a suspect class, in which case the exacting strict scrutiny test applies. *Martin*, 295 F.3d at 712. However, Wagner's equal protection claim involves neither. She does not claim to be a member of a protected class, and, as mentioned *supra*, the right to an education is not a fundamental right. *See Rodriguez*, 411 U.S. at 33–34, 93 S.Ct. 1278.

■ This leaves Wagner with a "class of one" equal protection theory, which requires her to show that she has "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (internal quotations omitted); *Martin*, 295 F.3d at 712. "Under the rational basis test, state action is entitled to a presumption of validity[,]" and will not be overturned "as long as it is rationally related to a legitimate governmental interest." *Smith*, 129 F.3d at 429.

Here, Wagner complains that the different punishments FWCS meted out to her and the other consuming students were "grossly unfair" because each student was charged with violating Rule 31, yet Wag-

ner was expelled while the other offenders were merely suspended for three days and given some other incidental punishments.[15] (Pl.'s Resp. at 11.)

First, there is little doubt that FWCS has a legitimate interest in preventing school disruption and ensuring student safety by prohibiting the improper use of over-the-counter medication at school.

Further, FWCS clearly had a rational basis to differentiate between Wagner's misconduct and that of the consuming students because Wagner not only took the caffeine pills, but was responsible for introducing them into the school setting and distributing them to other students, thereby causing two students to suffer from rapid heart beat. Indeed, just as our criminal laws distinguish between those who distribute narcotics and those who merely possess them, FWCS was entitled to distinguish Wagner's conduct from that of other students. Under these circumstances, and in light of Wagner's serious misconduct, her punishment was rationally related to FWCS's legitimate interest in preventing disruption and protecting its students.[16]

## E. The State Law Defamation Claims

Having disposed of all of Wagner's federal claims, the Court may, in its discre-

---

**15.** Wagner's response brief on this issue is somewhat difficult to decipher, particularly given that she never mentions the words "equal protection" or cites to any cases. In fact, she apparently thinks that FWCS's differential treatment of her and the other offenders is tantamount to a "violation of ... due process" under an "arbitrary and capricious" standard. (Pl.'s Resp. at 11.) She is wrong. When a plaintiff complains about differential treatment by the government, she is complaining about equal protection, not due process. *See, e.g., Olech*, 528 U.S. at 564, 120 S.Ct. 1073; *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir.2000). Wagner's failure to realize this point in her response is

especially baffling since she properly alleged it in her complaint. (Compl.¶ 17) (alleging an equal protection violation for the uneven application of Rule 31).

**16.** Wagner also suggests that the differing punishments lack a rational basis because the supplemental punishments given the consuming students have not, at least in one case, been enforced. However, there is no evidence that FWCS's failure to prevent that student from attending sporting events or school dances was anything other than oversight. Further, given the severity of Wagner's conduct, FWCS's conduct was rational.

tion, eschew the "usual practice" of dismissing without prejudice the remaining state law claims that are here under the Court's supplemental jurisdiction, 28 U.S.C. § 1367(c), particularly when it "has already invested substantial judicial resources" or when the resolution of the state law claims is clear. *See Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501–02 (7th Cir.1999); 28 U.S.C. § 1367(a). Because both factors are present here, we turn to address Wagner's remaining state law defamation claims.

In Count V of her Complaint, Wagner contends that Turner and Howe made certain defamatory comments about her before the student body, and that these comments were made with the intent to harm and unfairly punish her.

However, Turner and Howe have moved for summary judgment, alleging that discovery has produced no facts which support this claim. In Indiana, to make out a claim for defamation Wagner must prove "(1) communication with a defamatory imputation; (2) malice; (3) publication; and (4) damages." *Gatto v. St. Richard School, Inc.*, 774 N.E.2d 914, 922 (Ind.App. 2002). Wagner apparently concedes that she cannot make out a claim for defamation since she has failed to respond to the Defendants' motion on the point, and has failed to offer any evidence on those elements. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

Accordingly, we will grant the Defendants' motion for summary judgment on Wagner's state law defamation claims.[17]

---

17. The Defendants' motion also asks for summary judgment to the extent Wagner has asserted a separate claim under IND. CONST. article 8, § 1(ensuring a free public education). While it is doubtful that this provision creates a cause of action, at least one available to

## CONCLUSION

For the foregoing reasons, Wagner's motion to strike is DENIED, and the Defendants' motion for summary judgment is GRANTED. The Clerk is directed to enter judgment in favor of the Defendants and against Wagner. SO ORDERED.

Wagner here, the Defendants' motion for summary judgment is being granted because Wagner offered no evidence or argument in opposition. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.