Anthony PATE, Plaintiff,

v.

UNITED STATES of America,
et al. Defendants.

No. CIV.A. 02–1529(RBW).

United States District Court,
District of Columbia.

July 23, 2003.

Frederick J. Brynn, Frederick J. Brynn, LLP, Washington, DC, for Plaintiff.

Stratton C. Strand, United States Attorney's Office, Harold Samuel Ginsberg, Holly Michelle Johnson, Office of Corporation Counsel, D.C., Washington, DC, for Defendants.

## MEMORANDUM OPINION

WALTON, District Judge.

Plaintiff, Anthony Pate, brings this action pursuant to the Civil Rights Act of 1971, 42 U.S.C. § 1983 (2000) and on District of Columbia ("D.C.") common law grounds. Both claims are predicated on plaintiff's proposition that the defendants violated his constitutional rights when they failed to provide him with a timely parole revocation hearing. The defendants named in the complaint include: the District of Columbia, the local entity responsible for operating the now defunct D.C. Parole Board; Margaret Quick, Chairman of the D.C. Parole Board at all times relevant to this proceeding; Jasper Clay and Michael Green, members of the D.C. Parole Board also during times relevant to this proceeding; and the United States as the "federal entity having created the United States Parole Commission." Compl. ¶ 8.[1] Currently before the Court are defendants District of Columbia's and Margaret Quick's motion to dismiss the claims that have been filed against them. For the reasons set forth below, the Court will deny defendant District of Columbia's motion and grant defendant Quick's motion.

## I. Factual Background

According to the allegations of the complaint, which is far from a model of clarity, plaintiff has been the subject of several criminal prosecutions. In one of those matters he was "sentenced to a period of incarceration by a District of Columbia Superior Court judge several years ago" for a crime he fails to identify; he was subsequently released on parole from this sentence. Compl. ¶ 9. Thereafter, plaintiff contends that he was incarcerated for two parole violations, "neither of which were sustained[,]" and he was "most recently released [prior to the events at issue] in November 1997." *Id.*

Apparently plaintiff managed to avoid any further legal troubles after his 1997 release until September 2, 1999, when, as directed by his parole officer, he met with several Metropolitan Police Department ("MPD") detectives concerning the murder of his brother. *Id.* ¶ 11. At that time, plaintiff was arrested and charged in Superior Court case number "F–6483–99 [with] first degree murder while armed." *Id.* On September 20, 1999, at plaintiff's "preventive detention hearing[,]" Superior Court Judge Patricia Wynn found that there was probable cause for charging plaintiff with involuntary manslaughter. *Id.* Plaintiff alleges that he was then granted work release privileges on September 21, 1999. *Id.* Work release was granted by Judge Wynn because she was apparently unaware that on approximately September 8, 1999, a parole warrant was issued for plaintiff's arrest by the District of Columbia Parole Board ("the D.C. Parole Board" or "the Board"). "[T]he warrant was not executed until February 3, 2000[,]" *id.* ¶ 12, and Superior Court criminal case number F–6483–99 was dismissed for want of prosecution on June 1, 2000. *Id.* ¶ 11.

---

**1.** References to "Compl." are to the complaint filed by plaintiff on August 5, 2002.

Although the homicide case had been dismissed, plaintiff's detention as an alleged parole violator continued thereafter. *Id.* ¶ 12. Prior to the expiration of its parole authority over plaintiff in August 2000, "[t]he D.C. Parole Board attempted to hold a parole revocation hearing for Mr. Pate on three occasions ... [,]June 27, July 19, and August 2, 2000." *Id.* Each time the hearing was purportedly continued, over plaintiff's objection, because the police officers involved in the matter failed to appear. *Id.* A fourth hearing was attempted on September 19, 2000, but that hearing was also continued due to the need for additional information from the United States Attorney's Office. *Id.* From October, 2000, when the United States Parole Commission (the "Parole Commission") assumed parole related responsibility for District of Columbia criminal offenders,[2] until April 2001, the Commission failed to take any action regarding plaintiff's pending parole revocation hearing, "despite receiving numerous written and verbal requests for a hearing from [p]laintiff, his family and various attorneys ..." *Id.* ¶ 15.

Upon review of the remaining paragraphs of the complaint, it appears that finally on June 19, 2001, a parole revocation hearing was held, at which time the hearing officer concluded that there had been no parole violation and recommended expedited review of plaintiff's case and plaintiff's immediate release and reinstatement to parole. *Id.* ¶ 20. Despite the hearing officer's recommendation, plaintiff was eventually released from detention only after filing a writ of habeas corpus with the Parole Commission sometime in early July, 2001. *Id.* ¶ 23. He was released "within a few days of receipt of the writ request ... without a revocation hear-

ing." *Id.* Plaintiff contends he was "wrongful[ly] incarcerat[ed] from June 1, 2000 to approximately July 14, 2001." *Id.* ¶ 1.

As indicated, plaintiff has filed a complaint alleging a violation of his statutory rights pursuant to 42 U.S.C. § 1983 (count one). In count two of his complaint, plaintiff alleges that the Parole Commission and the District of Columbia committed negligence and gross negligence by their alleged "failure to supervise and enforce policies and procedures ..." to ensure that his parole revocation hearing was held in a timely manner. Significant to the motion that is the subject of this opinion is the fact that plaintiff has named Margaret Quick, Chairman of the D.C. Parole Board during the time relevant to these proceedings, and the District of Columbia, as defendants. Plaintiff has brought suit against defendant Quick "in her individual capacity for actions under color of law." Compl. ¶ 5.

## II. The Parties' Arguments

Defendants District of Columbia and Quick have filed a motion seeking the dismissal of the complaint as it pertains to them. These defendants argue that the Court should dismiss the claims against them because "plaintiff's due process interest in a revocation hearing was not triggered until June 1, 2000, when his murder charges were dropped[ ]" and, because on

> August 5, 2000, just two months later, the D.C. Parole Board was abolished and the [Parole Commission] assumed all authority over parole matters for D.C. prisoners ... the District defendants had no means to ensure the plaintiff's constitutional right to a parole revocation hearing after August 5, 2000, and cannot be held liable for any failure

2. The Parole Commission assumed authority over all District of Columbia parole matters on August 5, 2000, pursuant to the National Capital Revitalization and Self–Government Improvement Act of 1997. *See* Pub.L. 105–33, 111 Stat. 712 (1997).

to provide such a hearing after that date.

Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss ("Defs.' Mem.") at 8–9. Furthermore, they contend that because plaintiff was held for "just over two months[ ]" (from June 1, 2000 until August 5, 2000) while parole related authority was vested with them, D.C. and Quick cannot be found as a matter of law to have violated of plaintiff's constitutional rights. *Id.* at 9. In addition, defendant Quick argues that she is entitled to absolute immunity because the scheduling of parole hearings is a "quasi-judicial function" and therefore she is absolutely immune from the claims plaintiff has lodged against her. *Id.*

In his six page opposition to the dismissal motion, three and a half pages which are devoted to recounting the facts as set forth in the complaint, plaintiff's counsel argues that the defendants' motion should be denied as premature because both of the arguments raised by them are "fact oriented" and therefore, resolution of these issues is "not appropriate ... prior to any meaningful discovery ..." Plaintiff's Opposition to Defendant District of Columbia's Motion to Dismiss ("Pl.'s Opp'n") at 1.[3] As grounds for his position, plaintiff advances several arguments. First, regarding the claim that holding plaintiff for a period of over two months without conducting a parole revocation hearing is not, as a matter of law, unreasonable and hence not a constitutional violation, plaintiff argues that "[w]hile there is no case on point as to what this jurisdiction considers 'reasonable' ... [,] with respect to this defendant some 65 days is unreasonable. This [, plaintiff posits,] raises a factual issue as to reasonableness that must [be] decided by the factfinder." *Id.* at 5. Second, regard-

ing defendant Quick's claims of absolute immunity, plaintiff argues that immunity is only warranted where officials "can prove that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 6 (citations omitted). The answer to this question, plaintiff contends, "is a factual issue ... [,]" which is not subject to resolution as a matter of law. *Id.*

## III. Discussion

### A. Standard of Review

Defendants have filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted. When considering such a motion, the court must accept as true all the factual allegations contained in the complaint. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). To survive a motion to dismiss, a complaint need only provide " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (quoting Fed.R.Civ.P. 8(a)). A motion to dismiss under Rule 12(b)(6) tests not whether a plaintiff will ultimately prevail on the merits, but only whether the plaintiff has properly stated a claim for which he is entitled to relief. *Woodruff v. DiMario*, 197 F.R.D. 191, 193 (D.D.C.2000). Thus, a complaint should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99.

---

**3.** The pages of plaintiff's opposition are not numbered; therefore, the Court refers to the pages of the opposition in the chronological order in which they were presented.

**B. Whether the District of Columbia Can be Held Liable for Failing to Conduct a Parole Revocation Hearing Between June 1, 2000 and August 5, 2000.**

The Supreme Court has held that a parolee has a liberty interest in his or her parole status. *See Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) ("We see, therefore, that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others."). Because of this liberty interest, the *Morrissey* Court established procedures designed to guarantee parolees due process prior to the revocation of their parole. *Id.* at 484–489, 92 S.Ct. 2593. In particular, regarding the revocation hearing itself, the Court held that such hearings "must be tendered within a reasonable time after the parolee is taken into custody." *Id.* at 488, 92 S.Ct. 2593. However, the Court did not specifically designate the time in which a hearing must be conducted in order to avoid due process concerns. It merely noted that "[a] lapse of two months ... *would not appear to be* unreasonable." *Id.* (emphasis added).

Defendants argue that, as a matter of law, courts in this jurisdiction have held that a 65–day delay in conducting a revocation hearing does not violate due process. They rely on *Long v. Gaines*, 173 F.Supp.2d 35 (D.D.C.2001) for this proposition. However, *Long* does not conclusively resolve the issue before this Court. The *Long* court had previously held that the "United States Parole Commission's parole revocation regulations, practices, and procedures violate[d] the requirements of the Due Process Clause of the Fifth Amendment of the United States Constitution as set forth by the Supreme Court in *Morrissey* ..." *Id.* In light of the court's ruling, the Parole Commission submitted a proposed plan that "set[ ] forth new procedures to ensure that parole revocation proceedings [would] occur in a timely fashion and [would] comport with due process of law." *Id.* at 36. The plan, which the *Long* court approved, included a provision providing that "[f]ull revocation hearings will occur between 50 and 65 days from arrest." *Id.*

Although the plan in *Long* was approved as meeting the requirements of due process, it by no means established, as a matter of law, that due process is always satisfied when a revocation hearing occurs within 50 to 65 days. In fact, the District of Columbia Circuit has recognized that "extended delays may well be reasonable in individual cases; *everything depends on the reason for the delay*." *Ellis v. District of Columbia*, 84 F.3d 1413, 1424 (D.C.Cir. 1996) (citations omitted) (emphasis added). And, in *Ellis* the court did not specify what time period would amount to an extended delay, but merely concluded that "[i]f the Board's policy [of holding revocation hearings within 30 days after notice of a parole warrant's execution] is followed, the District [of Columbia's] system clearly comports with due process." *Id.* Support for the defendants' position can therefore not be found in *Ellis*. Moreover, the other cases cited by the defendants do not call for a different conclusion. *See, e.g., Sutherland v. McCall*, 709 F.2d 730, 732 (D.C.Cir.1983) (holding that a 33–month delay between time parolee was arrested on a parole violator's warrant and the time his revocation hearing was conducted was unreasonable in light of the applicable statute that provided such hearing had to be held within ninety days); *Thomas v. United States Parole Comm'n*, No. 92–590, 1992 WL 193695, at *2 (D.D.C. Aug. 4, 1992) (holding that 195 day delay before holding prisoner's revocation hearing was unreasonable in light of applicable statute,

which, although repealed, was applicable to the plaintiff and required that such hearings be held within 90 days of the re-arrest); *Arnold v. United States Board of Parole*, 390 F.Supp. 1177, 1179 (D.D.C. 1975) (holding that a period of five months between issuance of warrant and revocation hearing was unreasonable. "[Petitioner] is entitled to a prompt parole revocation hearing within a reasonable time following his return to custody, which, in this case, is the date the warrant-detainer was issued by the Board of Parole."). Because the cases cited by the defendants involve periods in great excess of the time that plaintiff was confined, they do not aid the Court in determining whether, as a matter of law, a 65 day delay can never be held to violate a plaintiff's constitutional rights.

Thus, although plaintiff's argument appears deceptively simple to resolve, it is the Court's opinion that while a two month delay may be reasonable in most situations, there may be situations in which such a delay could be considered unreasonable, depending on the factual circumstances of a particular case. Accordingly, the Court cannot conclude on the current record that "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99; *see also Long v. Gaines*, 167 F.Supp.2d 75, 81, 83 (D.D.C.2001) (holding that plaintiffs, who challenged the Parole Commission's guidelines that included a provision providing for "[a] local revocation hearing . . . within sixty days of the probable cause determination[ ]" and an "[i]nstitutional revocation hearing . . . within ninety days of the date of the execution of the violator warrant upon which the parol-

ee was retaken[,]" had not failed to state a claim because "the Supreme Court has established that parolees retain a liberty interest in their freedom, and that parolees are entitled to both a prompt finding of probable cause and a final revocation hearing within a reasonable time . . ."). Therefore, at this time, the Court will decline defendants' invitation to hold as a matter a law that a delay of 65 days in conducting a parole revocation hearing can never amount to a constitutional violation.[4] Resolution of this issue must be left to another day after discovery into the circumstances surrounding plaintiff's situation has been conducted.

**C. Whether the Claims Against Defendant Quick Can be Dismissed on Absolute Immunity Grounds.**

Plaintiff has asserted claims against defendant Quick based on her "duty to supervise the administrative and ministerial activities and personnel of the D.C. Parole Commission as well as the duty to oversee parole revocation proceedings . . ." Compl. ¶ 3. Plaintiff alleges that defendant Quick violated that duty by failing to ensure that a timely parole revocation proceeding was conducted in his case and he has brought suit against her in her individual capacity. Defendant Quick argues that she is entitled to absolute immunity because "the functions [she] performed . . . fall squarely within the crosshairs of quasi-judicial, absolute immunity." Defs.' Mem. at 11. In opposition, plaintiff argues that "[s]tate officials performing discretionary functions are shielded from liability for monetary damages [only] if they can prove that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pl.'s Opp'n at 6 (citations omitted). Defen-

---

4. Notably, plaintiff does not address the defendants' argument that he was not entitled to a revocation hearing prior to the dismissal of his homicide case in June 2000, despite the fact that the warrant was executed in February, 2000.

dants argue in reply that plaintiff's opposition addresses the standard for qualified immunity but fails to address the legal standard that governs absolute immunity. Defendants' Reply to Plaintiff's Opposition to Their Motion to Dismiss ("Defs.' Reply") at 6.

 Quasi-judicial immunity, also termed absolute immunity, is a complete bar to any lawsuit against a government official based on tasks the official performed that were within the scope of his duties. *Wagshal v. Foster*, 28 F.3d 1249, 1252 (D.C.Cir.1994). Although this form of immunity was traditionally afforded only to judges, "[c]ourts have extended absolute immunity to a wide range of persons playing a role in the judicial process" including prosecutors, lawclerks, and probation officers. *Id.* (citations omitted). Such grants of immunity are grounded on the theory that

> [w]hen officials are threatened with personal liability for acts taken pursuant to their official duties, they may well be induced to act with an excess of caution or to otherwise skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct.

*Forrester v. White*, 484 U.S. 219, 223, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). Although the Supreme Court held in *Forrester* that absolute immunity would not be afforded to a state court judge for his decision to discharge a probation officer because "it was clear that [the][j]udge ... was acting in an administrative capacity when he demoted and discharged [the probation officer]", 484 U.S. at 230, 108 S.Ct. 538, courts have extended such grants of immunity "in the appropriate circumstances to non jurists 'who perform functions closely associated with the judicial process[.]' " *In re Castillo*, 297 F.3d 940, 948 (9th Cir.2002) (quoting *Cleavinger v.*

*Saxner*, 474 U.S. 193, 200, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985)). Activities entitled to quasi-judicial immunity protection are those that are "routine or require[ ] no adjudicatory skill" if they are a part of the "judicial function." *Thompson v. Duke*, 882 F.2d 1180, 1184 (7th Cir.1989). Thus, in *Wagshal*, the District of Columbia Circuit afforded absolute immunity to a D.C. Superior Court case evaluator whose "assigned tasks included identifying factual and legal issues, scheduling discovery and motions with the parties, and coordinating settlement efforts. These [tasks, the court concluded,] obviously involve substantial discretion, a key feature of the tasks sheltered by judicial immunity ...". 28 F.3d at 1252.

Qualified immunity, on the other hand, is not an absolute bar to lawsuits of all types. *See Forrester*, 484 U.S. at 224, 108 S.Ct. 538 ("the Court has recognized a category of 'qualified' immunity that avoids unnecessarily extending the scope of the traditional concept of absolute immunity.") (citations omitted). "Qualified immunity or 'good faith' immunity is an affirmative defense that must be pleaded by a defendant official." *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citation omitted). When determining whether an official is entitled to qualified immunity, courts must ask whether the official engaged in conduct that violated the clearly established statutory or constitutional rights of a person of which the official should have known. *Id.*

 When determining what type of immunity an official is entitled to receive, courts use a " 'functional approach' ..." *Forrester*, 484 U.S. at 224, 108 S.Ct. 538. This approach requires the court to "examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and seek to evaluate the effect that exposure to particular

forms of liability would likely have on the appropriate exercise of those functions." *Id.* The burden of establishing entitlement to immunity is on the "[o]fficial who seek[s][the] exemption from personal liability[,]" and the official must demonstrate to the court that "such an exemption is justified by overriding considerations of public policy . . ." *Id.* The District of Columbia Circuit has

> distilled the Supreme Court's approach to quasi-judicial immunity into a consideration of three main factors: (1) whether the functions of the official in question are comparable to those of a judge; (2) whether the nature of the controversy is intense enough that future harassment or intimidation by litigants is a realistic prospect; and (3) whether the system contains adequate safeguards which are adequate to justify dispensing with private damage suits to control unconstitutional conduct.

*Wagshal,* 28 F.3d at 1252 (citations omitted).

■ Applying the three *Wagshal* factors to the circumstances in this case, it is apparent to the Court that defendant Quick should be granted absolute immunity. As the Ninth Circuit enunciated in *Sellars v. Procunier,* 641 F.2d 1295, 1303 (9th Cir.1981):

> The daily task of both judges and parole board officials is the adjudication of specific cases or controversies. Their duty is often the same: to render impartial decisions in cases and controversies that excite strong feelings because the litigant's liberty is at stake. They face the same risk of constant unfounded suits by those disappointed by the parole board's decisions. . . . Just as the decision-making process of judges must be kept free from fear, so must that of parole board officials.

The Court's conclusion is buttressed by the reasoning of the Seventh Circuit in *Thompson v. Duke,* 882 F.2d 1180, 1185 (7th Cir.1989), a case that is significantly analogous to this case and cited by the defendants as support for their position regarding defendant Quick. Similar to what occurred here, Thompson had been acquitted of the charge that was the basis for the parole violation warrant that resulted in his detention. *Id.* at 1181. However, Thompson's parole revocation hearing, which had been scheduled for the day after the completion of his trial, was not conducted and Thompson remained in his same detention status. *Id.* Thompson was then severely beaten by another inmate three days after his acquittal. *Id.* He subsequently filed a section 1983 lawsuit "against various state defendants, alleging that their failure to schedule and conduct a timely parole violation hearing constituted a deprivation of his constitutionally protected liberty interests." *Id.* at 1180. In challenging the district court's grant of summary judgment to the state officials, Thompson argued that they were not entitled to absolute immunity for their failure to timely schedule his parole revocation hearing because the "duty to schedule and hold such a hearing in a timely manner is a purely administrative function and thus [the officials] cannot claim absolute immunity." *Id.* at 1183 (internal quotation marks omitted). As support for this proposition, Thompson relied on the Supreme Court's decision in *Forrester,* where the Court stated that "[a]dministrative decisions, even though they may be essential to the very functioning of the courts, have not similarly been regarded as judicial acts." 484 U.S. at 228, 108 S.Ct. 538.

In rejecting Thompson's argument and holding that the officials were entitled to absolute immunity, the Seventh Circuit stated that the Supreme Court's decision in *"Forrester* was clearly an attempt to

stress that courts should recognize a difference between purely administrative activities and those which are a part of the judicial process." *Thompson*, 882 F.2d at 1183. The court held that the function of scheduling a revocation hearing is integral to the judicial process, and thus entitled to absolute immunity.

In the continuum of judicial proceedings, some judicial acts require extensive exercise of a judge's decision-making skills and others do not—yet all such acts make up the judicial function regardless of their isolated importance. In the judicial context, scheduling a case for hearing is part of the routine procedure in any litigated matter. However, the fact that the activity is routine or requires no adjudicatory skill renders that activity no less a judicial function....

Indeed, if we were to adopt Thompson's interpretation of *Forrester*, we would effectively subject judicial officers, as well as persons performing quasi-judicial functions, to unlimited litigation testing whether particular judicial functions, alleged to be mechanical or routine, were entitled to immunity from damages liability.... If scheduling a hearing is not a part of an adjudicatory or judicial function, then an action could be maintained against a judge for injuries to an incarcerated defendant resulting from the judge's alleged failure to schedule a hearing or trial within an applicable speedy trial limitations period, or the judge's alleged failure to conduct a hearing or trial on the date scheduled.... Such situations are foreclosed by *Forrester*, which confirmed absolute immunity from all damages for all acts carried out as a part of the judicial function. Absolute judicial immunity was removed only for that narrow range of purely administrative acts, such as [the employment decision at issue in *Forrester*],

which are unrelated to the judicial function.

*Id.* at 1184–85. *Cf. Montero v. Travis*, 171 F.3d 757, 761 (2d Cir.1999) ("[W]e join our sister circuits and hold directly that parole board officials, like judges, are entitled to absolute immunity from suit for damages when they serve a quasi-adjudicative function in deciding whether to grant, deny, or revoke parole.") (citations omitted); *Johnson v. Rhode Island Parole Bd. Members*, 815 F.2d 5, 8 (1st Cir.1987) ("Given the small degree of contrary thought, we join those circuit courts which have addressed this issue and conclude that the defendant parole board members are entitled to absolute immunity from liability for damages in a § 1983 action for actions taken within the proper scope of their official duties."); *Sellars*, 641 F.2d at 1302–03 ("In our view, parole board officials are entitled to absolute immunity from suits by prisoners for actions taken when processing parole applications.... The 'functional comparability' test set forth most explicitly by the Supreme Court in *Butz v. Economou*, 438 U.S. [478, 512–17, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) ] ... requires that we look not just to the title of a state or federal official, or to his or her location within the bureaucratic superstructure, but to the official's function as well in determining the question of immunity.... We believe that parole board officials perform functionally comparable tasks to judges when they decide to grant, deny or revoke parole."). *But see King v. Simpson*, 189 F.3d 284, 288 (2d Cir.1999) (reversing and remanding district court's ruling that parole commissioner was entitled to absolute immunity for delaying the release date of the plaintiff parolee. "Taking the allegations of the complaint as true, which we must, [the parole commissioner] rescinded King's effective parole date even though relevant regulations did not permit the delay of King's release under these cir-

cumstances.... It is unclear whether [the parole commissioner's] alleged action in retarding, or delaying, King's effective parole date pending a hearing on the institutional incident report filed against him was an adjudicative function like denying or revoking parole or merely an administrative function like scheduling or making a recommendation."); *Wilson v. Rackmill,* 878 F.2d 772, 776 (3rd Cir.1989) (reversing and remanding district court's ruling that parole examiners were entitled to absolute immunity since the complaint alleged that the examiners performed "adjudicatory duties," which would be protected by absolute immunity, and "executive and administrative duties, entitling them to qualified or good faith immunity.").

Similarly, in *Doyle v. Camelot Care Centers, Inc.,* 305 F.3d 603, 622–23 (7th Cir. 2002), the Seventh Circuit extended its reasoning in *Thompson* and provided absolute immunity to two administrative law judges ("ALJs") for their alleged failure to timely schedule the plaintiffs' administrative hearings to review a state child welfare agency's determinations that they were guilty of neglecting minor children. The plaintiffs in *Doyle* had both been implicated by the agency of being guilty of abusing and neglecting minor children pursuant to a state statute. *Id.* at 611–12. As part of the administrative process related to the neglect and abuse findings, the plaintiffs' timely requested administrative hearings to challenge these determinations. *Id.* at 611. "Despite [a] State mandate to docket appeals within thirty days," the chief ALJs assigned to plaintiffs' cases failed to timely conduct hearings. *Id.* In determining that the chief ALJs were entitled to absolute immunity, the court, citing *Thompson,* held that although "[s]cheduling determinations ordinarily are a relatively routine task[,][t]his fact neither strips the scheduling decision of its judicial nature nor renders it a purely administra-

tive function. Rather ... docketing forms an integral part of the adjudicatory process." *Id.* at 623. The court went on to reason that:

> the fact that neither Chief ALJ presided over [the plaintiffs'] proceedings is not dispositive of this matter. Moreover, rendering an individual liable for his scheduling determinations would engender the very conduct that absolute immunity serves to prevent—decisionmakers operating with excess of caution rather than with objectivity and independence because they fear litigation. Consequently, the [district court] correctly concluded that absolute immunity bars claims against the Chief ALJs concerning their failure to afford [the plaintiffs] administrative hearings in a prompt manner.

*Id.; see also Castillo,* 297 F.3d at 943, 951 (holding that "Chapter 13 Bankruptcy Trustee enjoy[ed] absolute quasi-judicial immunity for scheduling and noticing a bankruptcy confirmation hearing.... Both the scheduling and giving notice of hearings are part of the judicial function of managing the bankruptcy court's docket in the resolution of disputes. This function is unquestionably discretionary in nature.").

■ In accordance with the reasoning of *Forrester, i.e.,* to protect those officials performing quasi-judicial functions from a stream of unfettered litigation, this Court concludes that the reasoning of the *Thompson* court is applicable here. This conclusion comports with this Circuit's recognition that absolute immunity should be extended to "quasi-judicial officials when (1) their activities are integrally related to the judicial process, and (2) they must exercise discretion comparable to that exercised by a judge." *Turner v. Barry,* 856 F.2d 1539, 1540 (D.C.Cir.1988) (citations omitted). Therefore, although this Court's Circuit Court of Appeals has not definitive-

ly ruled on this precise issue, this Court is confident that its ruling accurately predicts how this Circuit would likely rule on this issue when it is presented to it. *See, e.g., Gray v. Poole,* 275 F.3d 1113, 1115 (D.C.Cir.2002) (holding that social worker was entitled to absolute immunity for her submission of a statement in connection with a neglect action. "That activity was 'intimately associated' with the judicial process and, therefore, [the social worker] [was] entitled to absolute immunity from suit for what she said in the statement.") (citation omitted); *Wagshal,* 28 F.3d at 1252 (holding that "a case evaluator in the Superior Court" was entitled to absolute judicial immunity against a suit filed by a former litigant); *Turner,* 856 F.2d at 1541 (holding "that District of Columbia probation officers are absolutely immune from liability for damages in an action brought pursuant to 42 U.S.C. § 1983 for alleged errors in the investigation and preparation of presentence reports.").

 Significant to the Court's resolution of plaintiff's absolute immunity challenge is the fact that plaintiff has utterly failed to address defendant Quick's argument that she should be entitled to absolute, versus qualified immunity. Rather, plaintiff merely articulates the standard that governs qualified immunity and argues that "it is a factual issue as to whether the official acted reasonably." Pl.'s Opp'n at 6. He then does nothing to refute the claim that defendant Quick is entitled to absolute immunity in this action. This omission permits the Court to consider the argument conceded. *See Hopkins v. Women's Div., General Bd. of Global Ministries,* 238 F.Supp.2d 174, 178 (D.D.C.2002) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded. . . . Therefore, because the plaintiff has failed to address the defendants['] positions that certain claims in the complaint should be dismissed, the Court will treat those claims as conceded.") (citations omitted); *Day v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 191 F.Supp.2d 154, 159 (D.D.C.2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.") (citation omitted); *Bancoult v. McNamara,* 227 F.Supp.2d 144, 149 (D.D.C.2002) ("[I]f the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded, even when the result is dismissal of the entire case.") (citations omitted); *Stephenson v. Cox,* 223 F.Supp.2d 119, 122 (D.D.C.2002) ("The court's role is not to act as an advocate for the plaintiff and construct legal arguments on his behalf in order to counter those in the motion to dismiss. Consequently, the court treats the . . . [defendants'] arguments for dismissal, which lead to the dismissal of the case, as conceded.") (citations omitted).

Because the Court concludes that defendant Quick would be entitled to absolute immunity for her alleged failure to timely schedule plaintiff's parole revocation hearing, and because plaintiff has failed to specifically challenge defendant Quick's arguments in favor of absolute immunity, the Court concludes that defendant Quick's motion for dismissal should be granted.

SO ORDERED on this 23rd day of July, 2003.[5]

---

**5.** An Order consistent with the Court's ruling accompanies this Memorandum opinion.